STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
ROBERT RELDAN, DEFENDANT-APPELLANT.

Argued October 23, 1984—Decided July 24, 1985.

188

190

*Mark H. Friedman*, Assistant Deputy Public Defender, argued the cause for appellant (*Thomas S. Smith*, Jr., Acting Public Defender, attorney).

*Catherine A. Foddai*, Deputy Attorney General, argued the cause for respondent (*Irwin I. Kimmelman*, Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

HANDLER, J.

Defendant, Robert Reldan, charged with two counts of murder, appeals from the holding of the Appellate Division, which reversed the trial court's decision to suppress certain forensic evidence seized from defendant's automobile. The evidence, which was allegedly probative of defendant's guilt of the homicides, was discovered during a search that was executed pursuant to a valid warrant authorizing a search for evidence of unrelated robberies.

The defendant claims that the search exceeded the scope of the warrant and was unreasonable on several grounds. A vacuum was used to obtain human hair and other minute particles from the floor of the car. These items were subsequently examined microscopically to produce the forensic evidence linking defendant to the homicides. Moreover, the Bergen County detectives who executed the search warrant were assisted by members of the Federal Bureau of Investigation (FBI), who were ostensibly interested only in investigating defendant's possible role in the two homicides. The defendant also claims that a suppression order, granted pursuant to defendant's motion prior to an earlier trial on the same charges, controls the issue of admissibility.

In the earlier proceedings following his indictment on two counts of murder, defendant had moved to suppress the evidence seized in the automobile search. This motion to suppress was heard and decided in May 1979. The court issued an opinion and order granting the motion to suppress, which the State did not attempt to appeal at that time. The ensuing trial lasted from May 21 through June 16, 1979, when it ended in the declaration of a mistrial because the jury was unable to agree on a verdict. A second trial, which lasted from September 19 through October 17, 1979, resulted in convictions for first-degree and second-degree murder, but the judgments were reversed by the Appellate Division in May 1982 and the matter remanded for yet a third trial. *State v. Reldan*, 185 *N.J.Super.* 494 (App.Div.), certif. denied, 91 *N.J.* 543 (1982).

In anticipation of the third trial, the State moved before the trial court for a reconsideration of the May 1979 suppression order. The motion was heard in October 1983. The court determined that a new hearing on the suppression issue was warranted and, following that hearing, concluded that the evidence from the search would have to be suppressed because "the execution of the warrant went beyond its scope" and there were no exigent circumstances justifying a warrantless search. The Appellate Division reversed, holding that the search was

objectively reasonable. This Court granted defendant's motion for leave to appeal. 97 *N.J.* 618 (1984).

I.

The facts of record indicate that two New Jersey women disappeared in October of 1975. S.H. of Haworth, New Jersey was last seen alive at her home on October 6 at approximately 3:30 p.m. S.R. of Demarest, New Jersey was last seen alive on October 14 at approximately 6:10 p.m. by a bus driver who dropped her at the intersection of County Road and Anderson Avenue in Demarest and by a fellow passenger on that bus.

S.H.'s body was found in a wooded area of Valley Cottage, Rockland County, New York, on October 27, 1975. S.R.'s body was found in Tallman State Park, about thirteen miles from where S.H.'s body was found, on October 28, 1975. Autopsies revealed that the cause of death in both cases was strangulation by ligature resulting in a fracture of the hyoid bone. Pantyhose had been used to strangle both women.

The ensuing investigation of the murders by the Bergen County Prosecutor's office resulted in a list of sex offenders who had recently been released on parole. Robert Reldan's name was among the names on that list. On October 17 an investigator interviewed Eileen Dalton, a toll collector employed by the Port Authority. The interview revealed that on October 14, the evening of S.R.'s disappearance, Ms. Dalton was at the Plaza of the Palisades Interstate Parkway collecting tolls from passengers headed southbound toward the bridge to New York. Ms. Dalton told police that at approximately 7:00 or 7:30 that night she received a toll from a twenty-five to thirty-year-old white male about 5'8" or 5'9" in height with dark brown hair just below the ears, and that as his car pulled away from the toll booth she heard a female voice scream, "Help me. Please help me. He's a maniac." FBI agents showed Miss Dalton a spread of six photographs, including one of Robert Reldan, and

she identified a photograph of Robert Reldan as looking like the man who was driving the car in question.

On October 21, the police spoke with Reldan on the telephone to arrange an interview with him. The next day, Reldan voluntarily appeared at the prosecutor's office. He was asked about his whereabouts during the approximate time that the two women had disappeared. Reldan made some statements that aroused the suspicions of the police officers. First, he placed himself at or near the intersection at which S.R. was last seen alive at about the time of her disappearance. Second, he made what the investigator considered a "Freudian slip" when he said to the police, "I hope no more girls get killed," at a time when the two women were still considered missing and not dead. The defendant also made some statements about his whereabouts at relevant periods that were partially or totally contradicted by other witnesses whom the police interviewed later.

On October 30, an investigator assisting in the homicide investigations interviewed the Director of the Department of Corrections Sex Offender Unit and defendant's therapist. Both stated that Reldan was capable of committing a rape-murder, and that if he did so, he would "act in such a manner as to lead the authorities to him."

Also on October 30, at about 2:00 p.m., Mr. Muino, a homeowner in Norwood, New Jersey, observed a man fitting Reldan's description trying to enter his home. The intruder fled the scene in a red Opal Kadette station wagon with a damaged left fender and a black metal drum in the rear. The home had been burglarized of several items of jewelry and other valuables earlier that month, on October 3.

On October 31, at about 10:30 a.m., Mr. Leeds of Closter, New Jersey observed a white male, whom he later identified from a photograph of Reldan, rummaging in his wife's pocketbook in the kitchen of his home. The Closter detective who responded to the call observed a 1969 red Opal Kadette station

wagon with a damaged front fender and a black metal drum in the rear parked down the street from the burglarized home. A license plate check revealed that the car was registered to a construction company owned and operated by Reldan.

Defendant was arrested in Englewood on October 31. His car at that time was still in Closter. The police impounded the car and towed it into the Closter police garage. Later that day, Bergen County police applied for a warrant to search the car for evidence of the break and entries.

In the application, they requested permission to search the defendant's red Opal Kadette for "the proceeds of the break and entry of the residence of Mr. and Mrs. Muino on October 3rd" and for "articles of evidentiary value in the investigation of the attempted break and entry the Muino residence on October 30th." The application also sought permission to investigate the car for evidence of "the break and entry of the Leeds residence on October 31st including, but not limited to, finger-prints, implements used to commit the break and entries, stolen property listed on the attached sheet and anything else of evidentiary value that a complete and thorough search might disclose." The "attached sheet" listed numerous items of jew-elry and other personal property.

A warrant authorizing the police to search the car for evi-dence and proceeds of the break and entries and possible robberies was issued shortly thereafter. The automobile search was executed on November 1, 1975 by Bergen County law enforcement officials assisted by FBI agents. During the search, officials vacuumed the interior of the car and retrieved samples of human hair from the right front floor mat, the rear seat, and underneath the rear seat. The hairs were later taken to an FBI laboratory and examined microscopically. Besides the hair, other items were seized in the search and were itemized in a three-page inventory. Reldan's arrest and indict-ment for the two murders followed the search and seizure.

## II.

Defendant does not dispute the legality of the warrant to search his car. The defendant contends that the seizure of materials by vacuuming the automobile, the subsequent microscopic examination of this material, and the execution of the search warrant with the assistance of the FBI exceeded the scope of the search warrant and were unrelated to the robberies. We deal initially with the grounds relating to whether the vacuuming of the car and the subsequent microscopic examination of the materials obtained exceeded the scope of the warrant or were otherwise unreasonable.

Defendant contends that the vacuum sweep of the car's interior was itself unreasonable. It is well settled that officers searching a person's home, car or belongings under authority of a search warrant are authorized to use only those investigatory methods, and to search only those places, appropriate in light of the scope of the warrant. *Harris v. United States*, 331 *U.S.* 145, 152, 67 *S.Ct.* 1098, 1102, 91 *L.Ed.* 1399, 1407 (1947). An analysis of the reasonableness of the methods used in a search, as well as the areas searched, should focus upon whether the search in its totality was consistent with the object of the search. *Id.* "A warrant to search a vehicle would support a search of every part of the vehicle that might contain the object of the search. When a legitimate search is under way, and when its purpose and its limits have been precisely defined, nice distinctions between * * * glove compartments, upholstered seats, trunks, and wrapped packages, in the case of a vehicle, must give way to the interest in the prompt and efficient completion of the task at hand." *United States v. Ross*, 456 *U.S.* 798, 821–22, 102 *S.Ct.* 2157, 2170–71, 72 *L.Ed.*2d 572, 591 (1982).[1]

---

[1]In *Ross*, a case involving a warrantless search, the Court ruled that "[t]he scope of a warrantless search based on probable cause is no narrower—and no broader—than the scope of a search authorized by a warrant supported by

■ Here, the warrant authorized the search for numerous items of personal property, as well as evidence relating to the alleged crimes. Presumably none of the items of stolen property was so minuscule as to require a vacuum to retrieve it. On the other hand, as the State points out, the vacuum could have been effective in retrieving small particles of jewelry that may have broken off—for example, backs of earrings, clasps of necklaces, and small gems. In addition, the vacuum could appropriately have been used to uncover other evidence of the break and entries, such as soil particles, debris, paint chips and the like. The application for the search warrant recited adequate facts to demonstrate probable cause and specifically requested judicial authorization to search defendant's automobile for criminal evidence relating to the "break and entry * * * including *but not limited to,* fingerprints, implements used to commit the break and entries, * * * *and anything else of evidentiary value that a complete and thorough search might disclose.*" (Emphasis added.) Consequently, it does not appear that a search consisting of the retrieval by the use of a vacuum of debris from the floor of an automobile in connection with the execution of a search warrant directed to evidence of household burglaries exceeded the scope of the warrant either as to the areas searched or items sought.[2]

---

probable cause." 456 *U.S.* at 823, 102 *S.Ct.* at 2172, 72 *L.Ed.*2d at 593. Our decisions have held that "[t]he scope of a warrantless search of an automobile is defined by the object of the search and the places where there is probable cause to believe that it may be found." *State v. Esteves,* 93 *N.J.* 498, 508 (1983); *State v. Guerra,* 93 *N.J.* 146, 151 (1983).

2It is true that the Fourth Amendment and Article I, Section 7 of the State Constitution prohibits "general searches and unrestrained seizures by officers acting under the unbridled authority of a general warrant." *State v. Muldowney,* 60 *N.J.* 594 (1972). Although the description of items in a warrant must be sufficiently definite to prevent searches conducted at the whim of an officer, *id.; State v. Seefeldt,* 51 *N.J.* 472 (1968), a warrant granting an officer some discretion in searching for items that fall within a named category is not necessarily invalid. *State v. Muldowney, supra,* 60 *N.J.* at 600–01. "[T]he description of items to be seized need only be as specific as the circumstances

We are not persuaded that the search in terms of the vacuuming of the car was otherwise unreasonable. In the context of the "automobile exception" to the warrant requirement, we have recognized the diminished expectation of privacy that attends car ownership and use. *See State v. Esteves*, 93 *N.J.* 498, 504 (1983); *State v. Patino*, 83 *N.J.* 1, 9 (1980). This circumstance greatly colors the reasonableness of a search of a car. Although the exception is often seen as the result of a ready mobility of cars, "less vigorous warrant requirements govern because the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office." *South Dakota v. Opperman*, 428 *U.S.* 364, 367, 96 *S.Ct.* 3092, 3096, 49 *L.Ed.*2d 1000, 1004 (1976). Recently, in *California v. Carney*, 471 *U.S.* ——, ——, ——, 105 *S.Ct.* 2066, 2069, 2070, 85 *L.Ed.*2d 406, 413, 414 (1985), the Supreme Court explained that expectations of privacy are diminished primarily because of "the pervasive regulation of vehicles, capable of traveling on the public highway" and that "[t]he public is fully aware that it is accorded less privacy in its automobiles because of this compelling governmental need for regulation."

The diminished expectation of privacy also explains why warrantless searches of automobiles are allowed when an automobile is in the exclusive control of the authorities, even though no exigent circumstances exist. *State v. Martin*, 87 *N.J.* 561, 568 (1981), relying on *Texas v. White*, 423 *U.S.* 67, 68, 96 *S.Ct.* 304, 305, 46 *L.Ed.*2d 209, 211 (1975); *Cardwell v. Lewis*, 417 *U.S.* 583, 593–94, 94 *S.Ct.* 2464, 2471, 41 *L.Ed.*2d 325, 336–37 (1974); *Chambers v. Maroney*, 399 *U.S.* 42, 52, 90 *S.Ct.* 1975,

---

will allow." *State v. Tunnell Citgo Services*, 149 *N.J.Super.* 427, 431 (App.Div. 1977). In this case, the authority to search for "anything else of evidentiary value ..." must be read in the context of the particular items specified in the warrant and the particular crime that is the occasion for the warrant. *United States v. Christine*, 687 *F.*2d 749 (3d Cir.1982); *see State v. Bisaccia*, 58 *N.J.* 586 (1971). Thus viewed, the warrant did not authorize "a general exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire*, 403 *U.S.* 443, 467, 91 *S.Ct.* 2022, 2038, 29 *L.Ed.*2d 564, 583 (1971).

1981, 26 *L.Ed.*2d 419, 428–29 (1970); *see also South Dakota v. Opperman, supra,* 428 *U.S.* 364, 96 *S.Ct.* 3092, 49 *L.Ed.*2d 1000 (inventory search of vehicle, revealing marijuana in glove compartment, justified in part by lowered expectation of privacy in automobile); *accord State v. Alston,* 88 *N.J.* 211 (1981).

While a lowered expectation of privacy cannot serve to alter the express authority or expand the scope of a search warrant directed to an automobile, it is a factor bearing upon the reasonableness of such a search, as it is in a warrantless search based on probable cause. *See United States v. Ross, supra,* 456 *U.S.* at 823, 102 *S.Ct.* at 2172, 72 *L.Ed.*2d at 593. The diminished expectation of privacy may not excuse an excessive or patently intrusive search that goes well beyond the ambit of the underlying probable cause, whether or not pursuant to a warrant. Lowered privacy expectations, however, may nevertheless justify a search of areas and things with respect to which a person would not ordinarily have any personal, possessory or proprietary interests.

In this case, there can be no suggestion that dirt, debris, and the like found on the floor or surface of a car would be attended by any expectation of privacy or would implicate a car owner's proprietary or possessory interests. *See Cardwell v. Lewis, supra,* 417 *U.S.* 583, 94 *S.Ct.* 2464, 41 *L.Ed.*2d 325 (plurality of the Court decided that examination of tire of defendant's car for distinctive tread mark and paint scraping of car did not infringe any expectation of privacy; warrantless examination of exterior of car in this manner, with probable cause, was not unreasonable). As noted in the dissenting opinion in *Jacobsen v. United States,* 466 *U.S.* 109, 104 *S.Ct.* 1652, 80 *L.Ed.*2d 85 (1984), on a point not disputed by the majority, "in cases involving techniques used to locate or identify a physical item, the manner in which a person has attempted to shield the item's existence or identity from public scrutiny will usually be the key to determining whether a reasonable expectation of privacy has been violated." *Id.* at ——, 104

*S.Ct.* at 1671, 80 *L.Ed.*2d at 113; *see United States v. Chadwick,* 433 *U.S.* 1, 11, 97 *S.Ct.* 2476, 2483, 53 *L.Ed.*2d 538, 548 (1977); *see also State v. Von Bulow,* —— *R.I.* ——, 475 *A.*2d 995, 1018 (R.I.), *cert.* denied *sub nom. Rhode Island v. Von Bulow,* —— *U.S.* ——, 105 *S.Ct.* 233, 83 *L.Ed.*2d 162 (1984) ("defendant originally possessed a reasonable expectation of privacy in the pills and other contents of the black bag * * * and seizure by a private party does not alter defendant's legitimate original expectation of privacy.")

■ We are satisfied that the procedures involved in vacuuming defendant's car in effectuating the search warrant did not constitute an illegal search. Once the police officers obtained a valid warrant authorizing them to conduct "a complete and thorough search" of Reldan's car for evidence connecting him with the break and entries, the vacuuming of the floor of defendant's car did not unreasonably offend protectable privacy interests.

■ The defendant argues further that the subsequent microscopic examination of these materials was itself an unreasonable search. We disagree. Although laboratory examination or additional testing of the items seized in a valid search may under some circumstances create a greater or more extended intrusion than the initial search and seizure, and independently constitute an invasion of personal privacy, such additional measures are not necessarily unreasonable and invalid.

In this case, as noted, the initial seizure of the items removed from the floor of the car was itself not unreasonable. The area searched was not one entitled to a justifiable expectation of privacy. Moreover, none of the materials seized and subjected to a microscopic examination could reasonably have been considered the personal effects or private property of the defendant. They were common detritus—samples of dirt, debris, hair, and the like.

■ In addition, if subsequent testing of items lawfully seized does not serve to reveal matters of a personal nature relating to an individual's privacy, it will not be deemed an unreasonable search. In this case the subsequent analysis of the materials that were lawfully seized from the floor of the car did not independently expose defendant's personal affairs or private life. Nor did the intrusion occasioned by the analysis subject defendant to humiliation, embarrassment, or physical discomfort.

In *Jacobsen v. United States, supra,* 466 *U.S.* 109, 104 *S.Ct.* 1652, 80 *L.Ed.*2d 85, a majority of the Supreme Court upheld both the search by a federal agent of a mutilated package of white powder that private freight carrier employees had discovered and the government's subsequent testing of the powder to determine if it was cocaine. In the majority's view, the laboratory tests did not present any fourth amendment invasion since the tests would determine only whether or not the substance was cocaine, and not what else it might be. Since the defendant had no protectable interest in using, possessing, or distributing cocaine, the majority reasoned he did not have a protectable interest in preventing officers from discovering that it was cocaine. *Id.* at ——, 104 *S.Ct.* at 1662, 80 *L.Ed.*2d at 101.

The majority's analysis in *Jacobsen* strongly suggests that defendant here could have no justifiable expectation of privacy in the debris on the floor of his car, because, even if it were not illegal contraband, it could hardly be considered a personal effect the examination of which would expose a personal matter of individual privacy. Consequently, because the microscopic analysis of this material could not serve to reveal any matters of a specially personal nature, it cannot be considered a search that trenches upon protectable privacy interests. *See Commonwealth v. DeWitt,* 226 *Pa.Super.* 372, 377, 379, 314 *A.*2d 27, 30, 31 (1973) (use of ultraviolet detection lamp implicated defendants, who had come in contact with hashish treated with fluorescent grease; "defendant had no reasonable expectation

of privacy as to presence of foreign matter on their hands independent of the privacy of their premises, which had been legitimately invaded by the police;" moreover, detection involved "no personal indignities or physical discomfort, and was neither annoying, frightening, or humiliating").[3]

The significance of the testing in this case may be contrasted with that considered in *State v. Von Bulow, supra,* —— *R.I.* ——, 475 *A.*2d 995. There the subsequent governmental testing represented "a significant expansion of the private search because it positively identified the unknown composition of the pills." *Id.* at 1018. The testing served to reveal information of a personal nature—the identity of the pills—that was a matter of individual privacy. Similarly, in *Stanley v. Georgia,* 394 *U.S.* 557, 89 *S.Ct.* 1243, 22 *L.Ed.*2d 542 (1969), three concurring justices ruled that officers violated the fourth amendment when, in looking for gambling evidence under a valid warrant, they found and viewed a reel of film. The subsequent examination revealed the contents of the film, thereby disclosing matters of individual privacy, and therefore, it constituted a search beyond the scope of the warrant. *Cf.* W. LaFave, *Search and Seizure,* § 2.6 at 377–78 (1978) (When law enforcement authorities look through person's refuse, justifiable expectation of privacy is invaded "for one's trash may expose 'intimate areas of an individual's personal affairs' and 'can reveal much about a person's activities, associations and beliefs.' ") (quoting *California Bankers Ass'n v. Shultz,* 416 *U.S.* 21, 94 *S.Ct.* 1494, 39 *L.Ed.*2d 812 (1974) (Powell, J., concurring )).

---

[3]Protectable privacy interests may also be evident in terms of where the material is situated and how it is obtained. *See Cupp v. Murphy,* 412 *U.S.* 291, 295, 93 *S.Ct.* 2000, 2003, 36 *L.Ed.*2d 900, 905 (1973) (scraping, by police, under defendant's fingernails, which upon further testing revealed traces of victim's skin, blood cells, and clothing, constituted "the type of severe, though brief, intrusion upon cherished personal security that is subject to constitutional scrutiny"). As discussed, examination of material from the floor of defendant's automobile does not impinge upon such an interest.

In this case, as noted, the initial seizure of debris from the floor of the car was valid; defendant had no original expectation of privacy or proprietary interest as to these materials. Further, the subsequent microscopic analysis did not serve to reveal any matter of individual personal privacy. It did not therefore constitute an impermissible, intrusive search.

It is also contended by defendant that the search was unreasonable and invalid because it was pretextual. In this respect defendant stresses in particular the participation of the FBI in the vacuum search and subsequent microscopic examination of the particles removed from the floor of the car.

The critical question is whether the search conformed to the authorization given by the warrant and was not otherwise unreasonable. In *State v. Bruzzese*, 94 *N.J.* 210 (1983), we ruled that the propriety of the search and seizure of items not otherwise covered by a valid warrant is to be judged according to an objective standard of reasonableness; the subjective motives of the police officers who executed the search are not dispositive as to the reasonableness of the search. *Id.* at 219; *see Scott v. United States*, 436 *U.S.* 128, 138, 98 *S.Ct.* 1717, 1723, 56 *L.Ed.*2d 168, 178 (1978). Here, as already demonstrated, the search conformed to the search warrant and was otherwise reasonable. *See State v. Bruzzese, supra,* 94 *N.J.* at 240 (concurring opinion).

 The defendant has not cited any statute or regulation indicating that the FBI lacks the authority to assist local police officers in the investigation of crimes if asked or permitted to do so. *See Dugan v. State,* 130 *Ga.App.* 527, 203 *S.E.*2d 722 (1974). As noted, the application for the warrant sought authorization to conduct a complete and thorough search for "anything else of evidentiary value" that could link defendant to the commission of the crime and the warrant itself authorized "necessary and proper assistance." This situation may be contrasted with cases in which the search for and seizure of particular items could have no conceivable connection with the

scope of the authorized search pursuant to a warrant. *E.g.,* *United States v. Sanchez,* 509 *F.*2d 886 (6th Cir.1975) (warrant search of home for narcotics did not justify collateral search for explosives); *Anderson v. State,* 555 *P.*2d 251 (Alaska 1976) (warrant to search for illegal drugs did not justify separate seizure of slides relating to acts of lewdness).

In conclusion, the search of defendant's automobile in this case was valid. The use of a vacuum to recover materials from the floor of the car, the subsequent microscopic analysis of these materials, including human hairs, and the assistance of members of the FBI to effectuate this search conformed sufficiently to the authorization of the warrant and did not otherwise constitute an unreasonable invasion of defendant's protectable privacy interests.

### III.

The defendant also argues that the state is barred from relitigating the admissibility of this evidence. In a hearing prior to defendant's first trial, the evidence was ruled inadmissible, and the State did not seek leave to appeal the interlocutory suppression order. The defendant contends that the prior decision has become the law of the case and the suppression issue may not be reconsidered in anticipation of a retrial.

The "law of the case" doctrine sometimes requires a decision of law made in a particular case to be respected by all other lower or equal courts during the pendency of that case. The Appellate Division has explained and applied the principle in a number of recent decisions, most notably in *State v. Hale,* 127 *N.J.Super.* 407 (1974). In that case a trial court ruled, during defendant's first trial, that the defendant's confession was involuntary and therefore inadmissible. Following a mistrial because of the jury's inability to agree on a verdict, the case was calendared for a retrial. At the second trial, the State sought and obtained a second *Miranda* hearing to enable it to reargue the admissibility of the confession. Ultimately, the

State persuaded the trial court to admit the confession that had previously been excluded. The Appellate Division, emphasizing the discretionary nature of the "law of the case," affirmed the court's decision to reconsider the admissibility issue. *See also State v. Powell,* 176 *N.J.Super.* 190 (App.Div.1980), certif. den., 87 *N.J.* 333 (1981) (allowed relitigation of admissibility of a confession implicating the defendant in five separate rapes); *State v. Cooper,* 165 *N.J.Super.* 57 (App.Div.), certif. dismissed, 81 *N.J.* 261 (1979) (determination in *Wade* proceeding not law of the case); *Texas Co. v. DiGaetano,* 71 *N.J.Super.* 413, 423 (App.Div.1962), aff'd, 39 *N.J.* 120, 123–24 (1963) (ruling regarding propriety of injunction not law of the case because of public interest in subject matter).

The Connecticut Supreme Court has explained the nature of the discretion that guides the application of the "law of the case" doctrine. With respect to a ruling on a motion to suppress, the court said:

"Where a matter has already been put in issue, heard and ruled on pursuant to a motion to suppress, the court in the subsequent trial, although not conclusively bound by the prior ruling, may if it is of the opinion that the issue was correctly decided, properly treat it as the law of the case, in the absence of some new or overriding circumstance." [*State v. Hoffler,* 174 *Conn.* 452, 389 *A.*2d 1257 (1978).]

Defendant argues that it is important promptly to resolve motions to suppress evidence in order to expedite the trial itself. Consequently, the failure of the State to have earlier sought reversal of the initial suppression order should give it binding effect in any retrial. We recognize that in our criminal justice system it is necessary to resolve, upon a challenge raised by the defendant, the legality of a search and seizure before the trial starts. A defendant is obligated to bring such a motion within 30 days of the initial plea. *R.* 3:5–7(a). The early and timely disposition of a motion to suppress can clarify and settle important questions relating to the admissibility of evidence at the criminal trial. It is thus conducive to the proper and orderly administration of criminal justice. *State v. Wade,* 89 *N.J.Super.* 139, 147 (App.Div.1965).

The early disposition of a motion to suppress also gives the party adversely affected by the ruling the opportunity to seek leave to appeal without necessarily disrupting or unduly delaying the criminal trial. However, a party is not obligated to seek leave to appeal from an adverse interlocutory order. An application for leave to appeal is not mandatory and it is not necessarily desirable. Sullivan, "Interlocutory Appeals," 92 *N.J.L.J.* 161 (1969). Interlocutory appellate review runs counter to a judicial policy that favors an "uninterrupted proceeding at the trial level with a single and complete review." *In re Pennsylvania R.R.*, 20 *N.J.* 398, 404 (1956); *accord* Clifford, "Civil Interlocutory Appellate Review in New Jersey," 47 *Law & Contemp.Probs.* 87, 97 (1984) (The court may be thought to harbor an "inhospitable attitude toward most interlocutory appeals."). Moreover, the grant of leave to appeal an interlocutory order is itself highly discretionary, *R.* 2:2–4; it is customarily exercised only sparingly, and its denial by the appellate court will not prejudice its further review in the event it is presented in a later appeal. Sullivan, *supra*, 92 *N.J.L.J.* at 161. For these reasons, the failure to seek leave to appeal from an interlocutory order cannot be dispositive as to whether that order will have continuing binding effect.

We are satisfied that the "law of the case" doctrine insofar as it is applied to rules or orders of an interlocutory nature is itself discretionary. It should be applied flexibly to serve the interests of justice. A prior ruling of an interlocutory nature cannot be relitigated in a subsequent retrial if relitigation would disserve the interests of justice. Conversely, a prior ruling may be relitigated if these interests are advanced. Thus the proper exercise of this discretion should take into account a number of relevant factors that bear on the pursuit of justice and, particularly, the search for truth.

One such factor involves whether the State has improperly sought an unfair advantage over the defendant. If by a subsequent relitigation the prosecutor would have gained some

tactical edge or strategic benefit that it could not have secured by an earlier review and reconsideration of the contested ruling, the "law of the case" doctrine may constitute a bar. Here, if the prosecutor had secured the right to appeal the original interlocutory suppression order, the same issue would have been before an appellate court and resolved at an earlier stage in the history of this criminal prosecution. The advantage to the prosecutor is no greater now than it would have been earlier. Conversely the prosecutorial detriment to defendant is no different. He faces a retrial on the substantive criminal charges with the order of suppression having been reversed on appeal, as he would have earlier.

Another factor relates to prosecutorial good faith in seeking to relitigate an earlier interlocutory ruling. In this case it is a retrial that provides the State with the opportunity to seek a reconsideration of the earlier suppression order. The circumstances that have led to a retrial are unrelated to the issue involved in the suppression of evidence. *State v. Reldan, supra,* 185 *N.J.Super.* 494. Consequently, it is not prosecutorial manipulation, overreaching or bad faith that has presented the State with another opportunity to seek to relitigate the search and seizure issue.

Despite the absence of untoward prosecutorial advantage or bad faith, the "law of the case" doctrine must also take into account fairness to the defendant. In *State v. Gregory,* 66 *N.J.* 510 (1975), the Court ruled that concepts of fairness, independent of the double jeopardy prohibition or collateral estoppel, required the State to join charges arising from the same criminal episode. The defendant could not be subjected to successive trials for common offenses. See *State v. Currie,* 41 *N.J.* 531 (1964). Here, the defendant cannot complain that his retrial on the murder charge implicates these notions of unfairness. Consequently, the relitigation of an issue that is ancillary to a retrial should not be considered a "later prosecution" that "smacks of harassment or oppression." *See State v. Gregory, supra,* 66 *N.J.* 510. Nor is the defendant unfairly deprived of

any reasonable expectation that the issue was finally resolved. An interlocutory ruling of a pretrial nature is vulnerable to relitigation at a subsequent trial. *Compare State v. Hale, supra,* 127 *N.J.Super.* 407 *with DiGiangiemo v. Regan,* 528 *F.* 2d 1262 (2d Cir.1975), *cert.* den. *sub nom. DiGiangiemo v. Olgiatti,* 426 *U.S.* 950, 96 *S.Ct.* 3172, 49 *L.Ed.*2d 1187 (1976).

Moreover, the defendant does not point to any evidence that was lost to him or gained by the State as a result of the passage of time and the later relitigation of the interlocutory ruling. As the Appellate Division below pointed out, the trial court in its discretion could have decided that since the first trial was effectively rendered a nullity by the jury's inability to agree on a verdict, it would be appropriate to relitigate the entire case, including pretrial motions to suppress.

Finally, the earlier interlocutory ruling called for the suppression of evidence ostensibly to serve the ends of deterrence of unlawful police conduct; the relitigation of this ruling in no way defeats these policies. Here, the State has been able to demonstrate that the underlying search and seizure were valid. In this context no benefits in terms of deterrence would be gained by barring reconsideration of the suppression ruling; and, indeed, a great deal could be lost in terms of the search for truth through the suppression of otherwise reliable evidence if reconsideration were to be foreclosed. *See United States v. Leon,* 468 *U.S.* ——, 104 *S.Ct.* 3405, 82 *L.Ed.*2d 677 (1984).

We therefore uphold the Appellate Division's ruling that the trial court had the authority to relitigate the defendant's motion to suppress the evidence obtained from the search of his car.

### IV.

We conclude that the court below properly determined that the search and seizure involving defendant's automobile was valid and that the State was entitled to relitigate this issue in anticipation of defendant's retrial.

Accordingly, the judgment of the Appellate Division is affirmed.

O'HERN, J., dissenting.

In the circumstances of this case, after six years and two trials, we should not reverse a pretrial ruling on the admissibility of evidence. I recognize that the law of the case doctrine is not an inexorable mandate to such a conclusion. Still I believe, as does the majority, that the doctrine expresses public policy concerns that should guide a court's discretion. We differ on the application of those policies to the case.

All agree that swift and certain punishment of crime is the single most important feature of a criminal justice system that seeks to act as an effective deterrent to crime. Victims and families of victims have equal interest in that certainty and finality. The families of crime victims relive the tragedy each time that the case is tried. Revision of pretrial rulings with attendant appeals adds to that delay and uncertainty.

Generally speaking, the phrase "law of the case," in the words of Justice Holmes, "merely expresses the practice of courts generally to refuse to reopen what has been decided...." *Messinger v. Anderson,* 225 *U.S.* 436, 444, 32 *S.Ct.* 739, 740, 56 *L.Ed.* 1152, 1156 (1912). As employed by courts, the doctrine dispenses with the need of considering again what has been previously decided in the same suit. Thus, "[t]he 'law of the case' rule ordinarily precludes a court from re-examining an issue previously decided by the same court, or a higher appellate court, in the same case." *United States v. Maybusher,* 735 *F.*2d 366, 370 (9th Cir.1984), *cert.* den., —— *U.S.* ——, 105 *S.Ct.* 790, 83 *L.Ed.*2d 783 (1985) (quoting *Moore v. Jas. H. Matthews & Co.,* 682 *F.*2d 830, 833 (9th Cir.1982)). The circumstances under which that re-examination takes place are not left, however, to standardless discretion. The doctrine generally requires that a decision on a former appeal be followed in any subsequent proceedings unless evidence subsequently in-

troduced is substantially different or the decision is "clearly erroneous and works manifest injustice." *Continental Bank & Trust Co. v. American Bonding Co.*, 630 *F.*2d 606, 608 (8th Cir.1980), *cited in United States v. Unger*, 700 *F.*2d 445, 450 n. 10 (8th Cir.), *cert.* den., 464 *U.S.* 934, 104 *S.Ct.* 339, 78 *L.Ed.*2d 308 (1983).

Defendants do not get multiple chances to retry issues. When a pretrial motion to suppress has been heard and decided, that decision becomes the law of the case. "Only if new grounds, including new facts, are advanced which the defendant could not reasonably have been aware of may a trial judge entertain a renewed motion to suppress." *Smith v. United States*, 406 *A.*2d 1262, 1263 (D.C.App.1979) (quoting *Jenkins v. United States*, 284 *A.*2d 460, 463–64 (D.C.App.1971)).

Underlying the rule are principles similar to collateral estoppel that give credence to "any prior adjudication of an issue in another action between the parties that is determined to be sufficiently firm to be accorded conclusive effect." *United States ex rel. DiGiangiemo v. Regan*, 528 *F.*2d 1262, 1265 (2nd Cir.1975), *cert.* den. *sub nom. DiGiangiemo v. Olgiatti*, 426 *U.S.* 950, 96 *S.Ct.* 3172, 49 *L.Ed.*2d 1187 (1976); *see also State v. Scott*, 68 *Or.App.* 386, 681 *P.*2d 1188 (1984) (change in law of pretrial identification warrants reconsideration of pretrial ruling after appeal).

Our decisional law has generally followed this approach. *See State v. Clarke*, 198 *N.J.Super.* 219 (App.Div.1985) (record made at first pretrial motion to suppress shall obtain on retrial and requires suppression); *State v. Fioravanti*, 78 *N.J.Super.* 253 (App.Div.1963) (renewed motion to suppress before second trial denied on law of the case doctrine); *State v. Roccasecca*, 130 *N.J.Super.* 585 (Law Div.1974) (discovery of new evidence warrants renewal of suppression motion); *see also State v. Lopez*, 166 *N.J.Super.* 301 (App.Div.), certif. den., 81 *N.J.* 287 (1979) (*Miranda* ruling need not be reconsidered at second trial).

Barring, then, significant changes in legal doctrine or facts, ordinarily the criminal justice system should seek to resolve pretrial issues with respect to the admissibility of evidence in as expeditious a manner as possible before trial. Our rules contemplate this. *R.* 3:5–7; *R.* 3:13–1(b).[1] Under the majority principle each retrial invites prosecution and defense to renew their pretrial motions with attendant appeals. We believe that the better rule for the criminal justice system is that a decision on a former appeal be followed in any subsequent proceedings unless later evidence or legal precedent is substantially different or the decision is "clearly erroneous and works manifest injustice." *Ante* at 191. We do not find those factors present here.

The crimes of murder were committed in October 1975. The search took place on November 1, 1975. The first motion to suppress was presented to the trial court in May 1979.[2] The motion addressed the single question whether the seizure of hair samples linking the defendant to the murder of these two victims was within the scope of the warrant issued by the municipal magistrate. That warrant was issued to search for evidence of crimes of breaking and entering and larceny in Norwood and Closter. The question came down to whether the search was within the scope of the warrant.

Both the Federal and State Constitutions are express in their recognition that general warrants are prohibited and that warrants issued upon probable cause shall particularly describe the place to be searched and the things to be seized. *U.S. Const.* amend. IV; *N.J. Const.* (1947) art. I, para. 7. There can be no

---

[1] Of course, we recognize that there are certain evidentiary rulings that are part of the trial itself, which will vary from trial to trial and thus cannot be resolved before trial. *See State v. Lopez,* 188 *N.J.Super.* 170, 173–74 (App.Div. 1983).

[2] In the disposition that we would make, we would not have occasion to consider the second pretrial ruling, although that court's concurrence with the 1979 ruling suggests that it was not clearly erroneous.

doubt here that the officers were lawfully authorized to search for any and all of the items particularly described in the warrant. The question is whether the warrant authorized them to search for the hair samples that were not described in the warrant. The controlling constitutional principle was set forth by the Supreme Court over fifty years ago:

> The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant. [*Marron v. United States*, 275 *U.S.* 192, 196, 48 *S.Ct.* 74, 76, 72 *L.Ed.* 231, 237 (1927), *quoted in Stanley v. Georgia*, 394 *U.S.* 557, 571, 89 S.Ct. 1243, 1251, 22 *L.Ed.*2d 542, 553 (1969) (Stewart, J., concurring).]

Our rule does not differ. *State v. Seefeldt*, 51 *N.J.* 472 (1968). In determining, then, what was within the scope of the warrant the trial court examined the record that was presented to the judge issuing the warrant. Our system reposes in that person the enormous responsibility to serve as "a neutral and detached magistrate" between citizen and state. *Johnson v. United States,* 333 *U.S.* 10, 14, 68 *S.Ct.* 367, 369, 92 *L.Ed.* 436, 440 (1948). In examining the record of the proceedings presented to the magistrate in that neutral and detached capacity, a court should consider the scope of the warrant to have been framed by the understanding communicated to the magistrate. *See State v. Bisaccia,* 58 *N.J.* 586, 592–93 (1971).

In this case, the police officers quite understandably were proceeding in their investigation on a step-by-step basis. At the stage when they presented the matter to the Closter magistrate, the investigating officers did not seek to obtain a warrant based on probable cause to believe that the defendant was a murder suspect or that the car contained evidence of the murders. The magistrate would have focused upon their request to search the car for evidence of the crimes of breaking and entering and larceny. The affidavit in support of the issuance of the warrant listed twenty-eight pieces of jewelry and valuables as the objects of the search. The warrant authorized a search for "certain property, to wit: see attached

list," with the list attached describing the jewelry. The trial court recognized that this was not a situation in which seemingly unrelated pieces of evidence would be related to the single crime described in the warrant. *Compare Andresen v. Maryland*, 427 *U.S.* 463, 482, 96 *S.Ct.* 2737, 2749, 49 *L.Ed.*2d 627, 643 (1976) (disparate bits of evidence form like a jigsaw puzzle the whole picture of fraudulent scheme with respect to one criminal transaction). Viewing the matter within the context of the affidavits presented to the magistrate and the warrant itself, the trial court ruled that the scope of the warrant was limited to the evidence of the crimes described in the warrant. It believed that to rule otherwise would convert "a seemingly precise and legal warrant" into a general warrant to search for all evidence of crime. *Stanley v. Georgia, supra*, 394 *U.S.* at 572, 89 *S.Ct.* at 1251, 22 *L.Ed.*2d at 553 (Stewart, J., concurring).

Hence, there is no disagreement with the majority's view that searches are to be tested by an objective standard. In essence, the trial court analyzed the question in terms of objective reasonableness in relationship to the items and crimes particularly described in the warrant. In this sense its analysis was similar to that employed in *State v. Bruzzese*, 94 *N.J.* 210 (1983). This is not a case, as there, where agents, in the course of a lawful arrest, came upon criminal evidence in plain view. For the record makes clear that the materials in question could not be determined to be evidential by mere inspection. Nor is there anything "unworthy" about the materials that were seized that requires different principles of law to be invoked. *Cf. United States v. Ross*, 456 *U.S.* 798, 822, 102 *S.Ct.* 2157, 2171, 72 *L.Ed.*2d 572, 592 (1982) (declining to distinguish between "worthy" and "unworthy" containers). This analysis of the scope of a search pursuant to a warrant is similar to our analysis of the scope of a warrantless search. Such a search is defined by the object of the search and the places where there is probable cause to believe that it may be found. *See State v. Guerra*, 93 *N.J.* 146, 150–51 (1983); *State v. Alston*, 88 *N.J.*

211, 232 (1981). In such circumstances, the validity of a search is tested "on objective grounds." *State v. Guerra, supra,* 93 *N.J.* at 152. Based on these principles it is not at all certain that the trial court's 1979 ruling on the scope of the warrant was clearly erroneous.

We do not understand the majority to base its ruling on the theory that the search was valid as a warrantless search under the automobile exception. The premise of that conclusion would be that the officers had probable cause to believe that the automobile contained evidence of the crime of murder and were searching for such evidence of murder in a movable vehicle. *See State v. Esteves,* 93 *N.J.* 498, 507–08 (1983); *State v. Martin,* 87 *N.J.* 561, 567–68 (1981). That premise, however, is not present in the record of this case. It was never contended at the first suppression hearing that the officers were searching for such evidence. At that hearing, the assistant prosecutor was candid to advise the trial court that "the State had little or no knowledge inculpating this defendant in the murder case." That court had no occasion then to consider the validity of the search as a warrantless automobile search.

At the second hearing, no officer who participated in the search testified to having probable cause to believe that the vehicle contained evidence of the murders, although the prosecutor made a legal argument to that effect. *Compare State v. Sarto,* 195 *N.J.Super.* 565, 574 (App.Div.1984) ("law of the case" doctrine would not preclude reconsideration of denial of suppression order but evidence showed that searching officer had probable cause to believe vehicle contained contraband and evidence was not suppressed).

We share the majority's concern that all competent and reliable evidence be available to the factfinding process. We would also want other such crimes to be prosecuted swiftly and with certainty. We believe that goal is better served by concluding that, absent the defined special circumstances, pretrial

rulings suppressing evidence before a first trial should obtain on a retrial.

*For affirmance*—Chief Justice WILENTZ, and Justices SCHREIBER, HANDLER, POLLOCK and GARIBALDI—5.

*For reversal*—Justices CLIFFORD and O'HERN—2.