268 N.J. Super. 194 (1993)
632 A.2d 1285
STATE OF NEW JERSEY, PLAINTIFF,
v.
LAVON D. JACKSON AND MICHELLE T. OQUENDO, DEFENDANTS.
Superior Court of New Jersey, Law Division Middlesex County.
Decided July 8, 1993.
*198 Kenneth J. Lebrato, Assistant Prosecutor, for the State (Robert W. Gluck, Middlesex County Prosecutor, attorney).
Lawrence Y. Bitterman, for Defendant, Lavon D. Jackson (Bitterman and Buono, attorneys).
Anderson D. Harkov, for Defendant, Michelle T. Oquendo (Kornreich & Harkov, attorneys).
WOLFSON, J.S.C.

I. Introduction

This is a motion to suppress drugs and certain other items seized pursuant to a search warrant issued for an attic storage closet at 42 Baldwin Street. The issues to be resolved are: (1) *199 whether there was probable cause to arrest defendants; and (2) whether the search warrant issued after defendants' arrest authorized the seizure and subsequent search of a locked safe found hidden in a large cardboard box located in that storage closet.

II. Factual Background

According to the Sergeant in charge of the New Brunswick Anti-Crime (Narcotics) Unit (ACU), Mr. Paul Schuster, information was received from a past reliable informant that Lavon (Chucky) D. Jackson and Michelle (RAH) Oquendo were in a specific location, the Pizza Mill bar, and were selling cocaine. As a result of that information, a "controlled buy" of cocaine was made by that informant.
Surveillance continued throughout the evening, during which time Oquendo and Jackson were repeatedly observed driving back and forth between the Pizza Mill and an apartment at 42 Baldwin Street. At approximately 2:00 A.M., they were followed from the Pizza Mill to the Baldwin Street premises, where they stayed for about twenty minutes, thereafter going to a motel where Oquendo had taken a room, and, where purportedly, she and Jackson were packaging their cocaine for sale.
A few days later, the same confidential informant told Schuster that Oquendo was again selling cocaine inside the Pizza Mill. A surveillance ensued in which police observed her leave the Pizza Mill, drive to 42 Baldwin Street, and enter the second floor where they lost sight of her. After a short period of time, she emerged, got back in her car and began driving toward the Pizza Mill bar. Members of the ACU followed her in an unmarked car. On the way, Oquendo failed to make a complete stop at a stop sign, resulting in a stop of her vehicle. At the time of the stop, Jackson was not in the car, but was close by, walking away from it. Both Oquendo and Jackson were detained and brought to the police station. After being advised of her Miranda[1] rights, Oquendo *200 was searched. A key to an Econo Lodge Motel room was found on her person. When asked if the room could be searched, Oquendo voluntarily agreed, signed a consent to search form to this effect, and asked only to be present during the search. Schuster agreed, and Oquendo accompanied other officers to her motel room. In the ceiling of her room, a small quantity of cocaine was discovered, along with empty glass vials used for packaging purposes.[2]
After returning to the station, both Oquendo and Jackson were questioned. When asked about 42 Baldwin Street, they both appeared startled, their faces literally "dropping" according to Schuster's testimony, which is accepted as credible. Despite these reactions, Oquendo denied knowing anything about 42 Baldwin Street, and Jackson denied ever having been there.
Thereafter Jackson was observed removing two keys from his key ring, in an attempt to hide them in his pocket. When asked about the keys, Jackson said they were for his apartment. Based upon the original surveillance, the discovery of the cocaine and empty glass vials at the Econo Lodge Motel, the defendants' obviously false statements concerning 42 Baldwin Street, and Jackson's furtive movements in trying to secret the keys, the ACU went to 42 Baldwin Street to investigate further. While there, they talked to a tenant, Gail Stein, who informed them that Jackson's cousin rented the third floor attic of the building, but that Jackson possessed the only key to that area. The keys seized from Jackson were then tested against a locked door on the second floor, which leads to the attic. One of the keys opened that door. The third floor attic was comprised of two open rooms and a locked storage closet. Jackson's second key opened that closet. At that point, both doors were closed and locked. The decision was then made to seek a search warrant for the third floor, leaving two officers behind to secure the premises.
*201 A warrant was thereafter issued, whereupon the attic storage room was searched, revealing a locked safe. The safe was seized, transported to the police station, and then opened, where approximately seven ounces of cocaine, a fully loaded .380 handgun, a box of ammunition, and some incriminating papers[3] were discovered.

III. Probable Cause To Arrest Defendants

The defendants essentially argue that the initial stop of Oquendo's car was not justified by any exception to the search warrant requirement and that Jackson was initially detained without probable cause.
While stopping an automobile and detaining its occupants obviously constitute a seizure under the Fourth and Fourteenth Amendments, Delaware v. Prouse, 440 U.S. 648, 653-54, 99 S.Ct. 1391, 1395-96, 59 L.Ed.2d 660, 667 (1979) (citations and footnote omitted), "[t]he essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of `reasonableness' upon the exercise of discretion by government officials, including law enforcement agents, in order `"to safeguard the privacy and security of individuals against arbitrary invasions...."'" "[Where] there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile ..." is constitutionally permissible. Id., 440 U.S. at 663, 99 S.Ct. at 1401, 59 L.Ed.2d at 673.
The rule has been further refined by subsequent decisional law, notably Michigan v. Thomas, 458 U.S. 259, 102 S.Ct. 3079, 73 L.Ed.2d 750 (1982) (police properly stopped car where defendant failed to signal a left turn); State v. Guerra, 93 N.J. 146, 459 A.2d 1159 (1983) (police properly stopped car for a broken *202 brake light); and State v. Alston, 88 N.J. 211, 440 A.2d 1311 (1981) (police properly stopped car where defendant was speeding). In this case, Oquendo was stopped after she failed to come to a complete stop at a stop sign. This furnished the required articulable and reasonable basis for stopping her. For the reasons explained below, it is clear that sufficient probable cause existed, independent of the traffic violation, to justify stopping her and for detaining Jackson as well.
Probable cause is a practical, nontechnical concept that must be determined by the "totality of the circumstances" and which may be affected by or based upon information received from a reliable informant. State v. Novembrino, 105 N.J. 95, 519 A.2d 820 (1987). If an officer had relied on the informant successfully in the past, State v. Perry, 59 N.J. 383, 390, 283 A.2d 330 (1971), and if "the information contained in the informant's tip is of such a detailed nature that it could reasonably lead a magistrate to infer that the informant had probably observed the items himself ... or had gained his information in a reliable way," (id. at 392, 283 A.2d 330) probable cause may, depending upon the information received, be established. In this case, the veracity of the informant was established by the statement of the ACU Sergeant, which the court finds to be credible, that the informant had proven reliable in the past. Furthermore, the informant provided a detailed description of the location of the alleged drug sales, knew the pseudonyms of both defendants (Chucky and Rah), and successfully executed a "controlled buy." These factors, viewed independently or in combination with police observations, clearly established probable cause that Jackson and Oquendo were engaged in a drug distribution scheme.
Sergeant Schuster repeatedly observed Jackson and Oquendo going back and forth between the Pizza Mill and 42 Baldwin Street. The informant had told police that defendants probably kept a stash somewhere in the immediate area of the Pizza Mill, based upon his (or her) observations that after they "sold out," the defendants would leave, drive around the block, and return with *203 more cocaine. The police also observed defendants drive to the Econo Lodge Motel, where Oquendo had registered, and where the informant had claimed that defendants "packaged" their cocaine for sale. Based upon the totality of all the circumstances, the police had ample probable cause to arrest Jackson or Oquendo.
Defendants' reliance on Ybarra v. Illinois, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), is misplaced. Ybarra involved a situation where the police indiscriminantly searched a dozen or so customers at a tavern, pursuant to a warrant authorizing the search of the tavern premises and one individual identified as "Greg," the bartender, for evidence of drugs. In fact, drugs were found on one of the customers searched, Ybarra, resulting in his arrest. The Supreme Court refused to permit the drugs to be used against Ybarra, holding that his mere presence at the tavern at a time when there was reason to believe that "Greg" would have drugs for sale was inadequate to establish probable cause.
In contrast, the police in this case had extensive evidence that Jackson was involved in a drug distribution scheme when he was arrested. Jackson was repeatedly seen with Oquendo at the Pizza Mill Bar and at 42 Baldwin Street; he went with her to the Econo Lodge Motel; he drove with her to and from those locations; and he was identified as an accomplice to Oquendo by the informant. While mere presence at the scene where drugs are being sold or are found is insufficient to establish probable cause, the facts of this case go decidedly beyond mere presence. These same facts and the "controlled buy" would independently have established probable cause to arrest Oquendo even absent the traffic violation.[4]

*204 IV. Validity of the Econo Lodge Search

After Oquendo was taken to police headquarters, she was advised of her Miranda rights and searched. A motel room key was discovered. When asked if she would consent to a search of that room, she agreed, signing a "consent to search" form to this effect, asking only if she could be present at the time of the search. Schuster agreed to this request. Hidden in the ceiling of her motel room was a small quantity of cocaine and some empty glass vials used for packaging cocaine.
Under the New Jersey Constitution, where the State seeks to justify a search on the basis of consent, "it has the burden of showing that the consent was voluntary, an essential element of which is knowledge of the right to refuse consent." State v. Johnson 68 N.J. 349, 353-54, 346 A.2d 66 (1975); State v. Dolly, 255 N.J. Super. 278, 284-85, 605 A.2d 238 (App.Div. 1991). In this case, the consent to search form signed by Oquendo expressly informed her: (1) of her right to refuse to consent to the search; (2) that her permission was given voluntarily and without threats; and (3) that anything discovered would be used against her in a criminal proceeding. Certainly, no evidence to the contrary, indicating coercion or intimidation, was introduced by Oquendo. No illegal warrant was brandished. See State v. LaDuca, 89 N.J. Super. 159, 214 A.2d 423 (App.Div. 1965); nor were guns drawn by ten State Troopers acting in tandem as occurred in State v. Dolly, supra. It is far more likely that she simply believed that the drugs and paraphernalia, hidden in the ceiling of the motel room, would not be found. Consequently, I conclude that Oquendo *205 do validly consented to the search, that the drugs and paraphernalia found hidden in the ceiling of her motel room were legally seized, and that the evidence thus seized is admissible.

V. Validity of the Search of Defendant Jackson

After the drugs were found in the Econo Lodge Motel room, Jackson was formally placed under arrest and given his Miranda rights. The subsequent search of Jackson and the seizure of his keys were incident to his arrest, and therefore proper.[5]
Furthermore, Jackson exhibited suspicious and/or furtive conduct both as to the keys, and relative to 42 Baldwin Street. Specifically, when police questioned Oquendo and Jackson concerning their connection with 42 Baldwin Street, their faces both "dropped." According to the testimony, which the court deems credible, they had a "How did you know about 42 Baldwin Street?" expression on their face. Sergeant Schuster specifically observed Jackson surreptitiously remove two keys from his key ring and try to hide them in one of his pockets.
Our courts have repeatedly held that a defendant's furtive movements may be considered in making a probable cause determination. See State v. Parsons, 83 N.J. Super. 430, 200 A.2d 340 (App.Div. 1964) (where defendant turned his face away from a potential witness); and see State v. Alston, 88 N.J. 211, 440 A.2d 1311 (1981) (where police observed three of the occupants of the car move about as if attempting to conceal something). When viewed in conjunction with the police observations and the confidential informant's tips detailed in Section II, supra, defendant Jackson's furtive movements in attempting to conceal the two keys *206 and his facial expression upon being questioned about 42 Baldwin Street, certainly established probable cause sufficient to justify his being placed under arrest, and to support the issuance of a search warrant for 42 Baldwin Street.

VI. Entry of the Attic Storage Closet at 42 Baldwin Street

Defendants argue that the initial warrantless entry into the attic storage closet at 42 Baldwin was invalid under the Fourth Amendment. In general, a police entry into a home constitutes a search. However, "[o]ne seeking to invoke the protection of the Fourth Amendment must establish that a reasonable or legitimate expectation of privacy was invaded by government action." State v. Marshall, 123 N.J. 1, 66, 586 A.2d 85 (1991).
Jackson was not a tenant at 42 Baldwin Street. In fact, he categorically denied ever having been there. Under the circumstances he cannot be said to have had any legitimate or objectively reasonable expectation of privacy in the third floor attic storage closet.[6] Moreover the "testing" of Jackson's validly seized keys in the second floor back door leading to the attic stairs and in the third floor attic storage closet, did not constitute a search within the meaning of the Fourth Amendment's prohibition against unreasonable searches and seizures. No evidence was seized, and no allegedly incriminating observations were made. Moreover, the fact that Jackson's keys opened the doors was neither the linch-pin nor crucial to the issuance of the warrant. Probable cause sufficient to justify the issuance of the warrant had *207 plainly been established by one or more of the following: (1) the ACU surveillance; (2) Gail Stein's statement regarding Jackson's access to the third floor; (3) the false statements made by both defendants concerning 42 Baldwin Street; (4) the defendants' look of surprise when 42 Baldwin Street was mentioned by police; and (5) the discovery of cocaine and related packaging paraphernalia at the Econo Lodge Motel, where both Jackson and Oquendo had been seen. Given the totality of these circumstances, the warrant cannot reasonably be said to be defective even if the keys were erroneously seized and or tested.

VII. Search of the Safe

Defendants contend that even if the warrant was properly issued for the search of 42 Baldwin Street, the specific seizure and transportation of the safe to police headquarters without a further warrant was invalid under State v. Marshall, supra, 123 N.J. at 1, 586 A.2d 85 and State v. Hempele, 120 N.J. 182, 576 A.2d 793 (1990). Both Hempele and Marshall involved warrantless seizures: Marshall involved an envelope seized from the mail depository of defendant's hotel room; and Hempele involved items taken from a curbside garbage can. In Marshall, the Supreme Court held that since investigators had a reasonable basis for believing that the envelope contained material evidence, the seizure of the envelope was not violative of the Constitution. 123 N.J. at 68-69, 586 A.2d 85. The Court in Hempele held only that items not "in plain view" could not be seized without a warrant, even if the items were discarded into garbage cans. 120 N.J. at 215, 576 A.2d 793.
Even if Jackson and Oquendo were correct in suggesting that the seizure of the safe from the third floor storage closet was warrantless, a conclusion rejected by this court, the police had more than a reasonable basis for seizing it pursuant to Marshall, in light of the extensive surveillance of the defendants, the information received from the informant, and the false statements made to the police.
*208 The precise issue, not yet squarely addressed by a New Jersey case, is whether a search warrant which authorizes the search of a specific area also permits the search and seizure of containers found therein which might reasonably contain the evidence sought by the warrant. In United States v. Ross, 456 U.S. 798, 821, 102 S.Ct. 2157, 2171, 72 L.Ed.2d 572, 591 (1982), the Supreme Court in dictum explained: "[A] warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers and containers in which the weapon might be found. A warrant to open a footlocker to search for marijuana would also authorize the opening of packages found inside." Furthermore, Professor LaFave has persuasively argued that "[p]laces within the described premises are not excluded merely because some additional act of entry or opening may be required. `In countless cases in which warrants described only the land and the buildings, a search of desks, cabinets, closets and similar items has been permitted.'" 2 W. LaFave, Search and Seizure 313-14 (1987) (footnote omitted); see also State v. Reldan, 100 N.J. 187, 195, 495 A.2d 76 (1985) (whether a particular search or seizure is consistent with the scope of a warrant depends upon "whether the search in its totality was consistent with the object of the search").
Courts in sister jurisdictions have upheld searches of closed or locked containers discovered while executing a valid search warrant for a particular premises. See Commonwealth v. Reese, 520 Pa. 29, 549 A.2d 909 (1988) (warrant to search an apartment for drugs authorized search of a jacket found within); Commonwealth v. Fleck, 324 Pa.Super. 227, 471 A.2d 547 (1984) (warrant to search defendant's apartment for evidence of burglary authorized search of gym bag found within); and Commonwealth v. Sellers, 236 Pa.Super. 191, 344 A.2d 689 (1975) (warrant to search one defendant's home authorized search of co-defendant's purse found within); see also State v. Hansen, 732 P.2d 127, 131 (Utah 1987) (warrant to search premises for drugs permitted search of locked box within, rejecting contention that a separate warrant was required to open the box).
*209 The federal courts have also dealt with this issue in a like fashion and have persuasively concluded that the Federal Constitution does not preclude the police from seizing and opening a locked safe or other container in circumstances such as those present in this case. For example, in U.S. v. Snow, 919 F.2d 1458 (10th Cir.1990), a warrant had been issued authorizing the search of the defendant's restaurant, the seizure of typewriters and printing material, and the seizure of all documents relating to several properties involved in an alleged scheme of criminal activity. Id. at 1461. In conducting the search the police discovered a locked safe, which was seized and opened, revealing incriminating evidence. The court rejected the argument that the scope of the warrant had been exceeded by the opening of a locked safe, concluding that "[t]he locked safe was a likely source for the specified documents and could therefore be opened." Id. at 1461. See also United States v. Martinez, 949 F.2d 1117, 1120 (11th Cir.1992) ("a general consent to search a specific area for specific things includes consent to open locked containers that may contain the objects of the search, in the same manner that such locked containers would be subject to search pursuant to a valid warrant"); United States v. Gonzalez, 940 F.2d 1413, 1420 (11th Cir.1991) (valid warrant to search defendant's house for documents and currency authorized police to search locked briefcase found in house); United States v. Rutkowski, 877 F.2d 139 (1st Cir.1989) (warrant to search premises for stolen handguns, jewelry, and coins authorized search of a coffee can and the envelopes inside); United States v. Morris, 647 F.2d 568, 572-73 (5th Cir.1981) (valid warrant to search defendant's home for proceeds of bank robbery authorized search of locked jewelry box); and see United States v. Newman, 685 F.2d 90 (3rd Cir.1982) (warrant to search defendant's office for shotgun, ammunition, and documents of ownership authorized search of briefcase found within).
Although article I, ¶ 7 of the New Jersey Constitution may very well afford our citizens greater protection against unreasonable searches and seizures than does the Fourth Amendment (see State v. Hempele, supra, 120 N.J. at 195, 576 A.2d 793 (and cases cited *210 therein)) neither public policy nor New Jersey decisional law compel a result different from that espoused in the federal authorities referenced above. Indeed, although not dispositive, Reldan, supra, 100 N.J. at 195, 495 A.2d 76, suggests an analysis which is both practical and consistent with the foregoing.
The inevitable conclusion is that the ACU was authorized to seize and subsequently search the safe found in the third floor attic storage closet. Probable cause was plainly established and the warrant was therefore clearly valid. By its terms, it authorized searching for evidence of violations of the Controlled Dangerous Substance Act. That the circumstances of the search and seizure of the safe "in its totality [are] consistent with the object of the search" (Reldan, supra, 100 N.J. at 195, 495 A.2d 76), cannot be reasonably disputed. Accordingly, since the safe falls within the scope of the warrant, the defendants' motion to suppress the evidence found in the safe is denied.
The State shall submit a form of order consistent with this opinion.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] Jackson, who remained at police headquarters, was told of the results of the search, and was thereafter formally arrested and advised of his Miranda rights.
[3] These consisted of folded white lined papers one of which was addressed to "Chucky" asking for "one-half"; and the other indicated that "RAH has the other 37 bags."
[4] Moreover, any contention that the information relied upon by the police for arresting defendants was stale, is clearly without merit. In State v. Blaurock, 143 N.J. Super. 476, 478-79, 363 A.2d 909 (App.Div. 1976), the Appellate Division held that an eighteen-day delay between the last reported surveillance and the filing of the affidavit supporting the warrant request did not preclude a finding that probable cause existed at the crucial time the warrant was issued. See also, United States v. Johnson, 461 F.2d 285, 287 (10th Cir.1972) ("where the affidavit properly recites facts indicating activity of a protracted and continuous nature, or a course of conduct, the passage of time becomes less significant").

The five-day time lapse in this case between the initial informant's tip and the arrest of defendants was clearly reasonable. This is especially so given the continuous course of conduct observed by police, all of which tended to confirm the information received from the confidential informant on two separate occasions.
[5] The seizure of the keys could also have been justified under the inventory search exception to the warrant requirement. Under this exception, "it is reasonable for police to search the personal effects of a person under lawful arrest as part of the routine administrative procedure at a police station house incident to booking and jailing the suspect." Illinois v. Lafayette, 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983).
[6] The "exigent circumstances" exception, where a search is necessary to prevent the disappearance of the suspect or of evidence, and where the circumstances fail to permit the searching officer sufficient time to obtain a warrant, (see State v. Guerrero, 232 N.J. Super. 507, 557 A.2d 713 (App.Div. 1989)), is not applicable in this case. Gail Stein, a second floor tenant at 42 Baldwin Street, told police that Jackson had the only key for the attic room. Furthermore, at the time of the search, both defendant Jackson and Oquendo were under arrest at police headquarters, and the premises were secured by two officers. Thus, the warrantless entry of the attic room was probably not required to prevent the disappearance of evidence or any suspect.