cullen2. 



IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN




 





NO. 3-90-148-CR





PAUL STEDMAN CULLEN,



 APPELLANT


vs.





THE STATE OF TEXAS,



 APPELLEE



 




FROM THE DISTRICT COURT OF TRAVIS COUNTY, 331ST JUDICIAL DISTRICT



NO. 101,826, HONORABLE BOB PERKINS, JUDGE PRESIDING



 




 Paul Stedman Cullen appeals his conviction for criminal mischief, see Tex.
Penal Code Ann. § 28.03 (1989 & Supp. 1992) (1), arising from his poisoning of the historic
"Treaty Oak" in Austin. This particular oak tree enjoys a notoriety based on its age and on
historical accounts that Stephen F. Austin signed a treaty with Central Texas Indian tribes on
this site. Appellant brings three points of error challenging (1) the trial court's exercise of
jurisdiction, (2) the introduction of evidence obtained from a warrantless search, and (3) the
jury instructions relating to the alleged destruction of the oak tree. We will affirm the
conviction.



BACKGROUND


 Appellant's arrest and conviction stem from his indictment for the damage and
destruction of the Treaty Oak. Appellant was accused of applying the herbicide hexazinone to
the historic tree without the consent of the tree's owner, causing pecuniary damage in an
amount exceeding $20,000. His indictment contained an enhancement provision because
appellant had previously been convicted of a burglary offense. 

 Appellant filed a pre-trial motion to quash the indictment, alleging that his
prosecution should come under the Texas statute prohibiting the desecration of venerated
objects. See 1973 Tex. Gen. Laws, ch. 399, § 1, at 883, 957 (Tex. Penal Code Ann. § 42.09,
since amended). A violation of this statute is a Class A misdemeanor, see § 42.09(c), and its
violation carries a less severe penalty than does the violation of the criminal mischief statute, a
second-degree felony when pecuniary damage exceeds $20,000. See § 28.03(b)(5). The trial
court overruled the motion and, over a plea of not guilty, the jury tried and convicted
appellant of second-degree criminal mischief. He was subsequently sentenced to nine years in
prison and was fined $1,000.


JURISDICTIONAL CHALLENGE 


 Appellant first assails the trial court's exercise of jurisdiction. He claims that the
district court lacked jurisdiction to try him since he should have been charged with the "special"
misdemeanor offense of desecration of a venerated object, which was not within the district
court's jurisdiction. Appellant asserts that the misdemeanor statute and the felony criminal
mischief statute are in pari materia, meaning they touch upon the same subject, have the same
general purpose and relate to the same conduct. In pari materia is a rule of statutory construction
that requires such statutes to be construed together, even if they contain no reference to each
other. Appellant argues that the misdemeanor, desecration of a venerated object, is a detailed
statute subsumed within the general felony offense of criminal mischief. Because it more
specifically proscribes the conduct of poisoning a tree and sets forth a different punishment, he
insists that the doctrine of in pari materia required the State to charge him with the more specific
misdemeanor offense. We disagree. 

 In Cheney v. State, 755 S.W.2d 123 (Tex. Crim. App. 1988), the court of criminal
appeals discussed at length the doctrine of in pari materia as a principle of statutory interpretation
and laid out an analytical framework for its application to criminal statutes. A reviewing court
must first determine whether both provisions cover the same general subject matter or persons,
and have a similar purpose or objective. If two statutes do not deal with the same subject,
persons, or purposes, they are not in pari materia and other rules of statutory construction will
dictate which one governs the offense in question. Id. at 127. If the statutes are in pari materia,
the reviewing court must determine if they conflict by setting out different punishment for the
same conduct. In this circumstance, the more specific statute controls. Id. Section 28.03 is
a general property-damage offense; its purpose is to proscribe knowing or intentional damage or
destruction to an owner's property. See § 28.03, Cmt. (1989). The statute's penalty provisions
focus upon the amount of pecuniary loss associated with the damage or destruction to the
property; lesser losses yield misdemeanor offenses; larger pecuniary losses constitute felonies. 
See § 28.03(b)(1-5). By contrast, section 42.09 addresses offenses against public order and
decency. The desecration statute in effect at the time of the offense provided that


 (a) A person commits an offense if he intentionally or knowingly desecrates:


 (1) a public monument; 

 (2) a place of worship or burial; or

 (3) a state or national flag.


 (b) For purposes of this section, "desecrate" means deface, damage, or otherwise
physically mistreat in a way that the actor knows will seriously offend one or more
persons likely to observe or discover his actions. 


 (c) An offense under this section is a Class A misdemeanor.


1973 Tex. Gen. Laws. Ch. 399, § 1, at 957 (Tex. Penal Code Ann. § 42.09, since amended). 
The legislature has placed the desecration statute in Title 9, entitled "Disorderly Conduct and
Related Offenses." Section 42.09 focuses upon conduct which the actor knows will offend
another; the underlying concern is the outrage or resentment caused by knowingly desecrating a
public monument. The resulting damage or destruction is not at issue and does not figure in the
punishment; rather, the focus is upon the actor's offensive conduct. 

 These two statutes are contained in different legislative acts, address differing
situations, require different elements of proof, and serve different objectives. We believe the
legislature intended to define two separate offenses with different elements and different levels of
punishment. It follows that section 42.09 is not a special subset of the general offense of criminal
mischief. Because the forbidden conduct is different, we hold the statutes are not in pari materia. 
See Cheney, 755 S.W.2d at 126 ("[Pari materia] is not applicable to enactments that cover
different situations and that were apparently not intended to be considered together"); Alejos v.
State, 555 S.W.2d 444, 450-51 (Tex. Crim. App. 1977) (statutes treating same subject are not in
pari materia where subject treated arises in different acts having different objects, and statutes not
apparently intended to be considered together). 

 Where statutes are not in pari materia, Cheney directs us to determine whether the
statutes may be harmonized or are in irreconcilable conflict. We detect no disharmony or conflict
between these two provisions; one statute addresses property crimes, the other addresses
disorderly conduct. The fact that both statutes can conceivably cover the same person and the
same property does not call for in pari materia construction of the provisions when each serves
a markedly different objective. Cheney, 755 S.W.2d at 129. The State could have elected to
prosecute appellant under either of these provisions if it could prove the elements comprising each
offense. Neither the State's election to prosecute under section 28.03 nor the trial court's
subsequent exercise of jurisdiction was error. We overrule appellant's first point.



WARRANTLESS SEARCH


 In his second point of error, appellant challenges the introduction of evidence taken
pursuant to a warrantless search of his truck. In his brief, appellant raises both state and federal
constitutional grounds in the same point of error. The court of criminal appeals has addressed the
possible dire consequences of failing to distinguish state and federal constitutional issues:



Attorneys, when briefing constitutional questions, should carefully separate federal
and state issues into separate grounds and provide substantial analysis or argument
on each separate ground. If sufficient distinctions between state and federal
constitutional ground is not provided by counsel, this court may overrule the
grounds as multifarious.



McCambridge v. State, 712 S.W.2d 499, 502 n.9 (Tex. Crim. App. 1986). Nonetheless, we will
exercise our discretion to review each issue. 

 Appellant claims this search violated both the federal and state constitutions. See
U.S. Const. amend. IV; Tex. Const. art. I, § 9. After reviewing the details and the object of this
warrantless search, we disagree. 

 On June 29, 1989, officers of the Austin Police Department arrested the appellant
in a parking lot and impounded his truck. The police did not conduct an inventory search, but
instead procured a search warrant and removed evidentiary items from the vehicle. More than
a month later, the police removed dirt particles from the open bed of the pickup truck, which still
remained in police custody. Eleven soil samples taken from the truck contained hexazinone, the
chemical found to have poisoned the Treaty Oak in June 1989. 


1) Federal Prohibition Against Unreasonable Search and Seizure


 The Fourth Amendment provides that the "right of the people to be secure in their
persons, houses, papers and effects, against unreasonable searches and seizures, shall not be
violated. . . ." U.S. Const. amend. IV. In Warden v. Hayden, 387 U.S. 294 (1967), the
Supreme Court noted that the primary object of the Fourth Amendment is the protection of
privacy, not the protection of property. Id. at 302-06. Later, in Illinois v. Andreas, 463 U.S.
765, 767 (1983), the Court observed that "[i]f the inspection by the police does not intrude upon
a legitimate expectation of privacy, there is no `search' subject to the Warrant Clause." The
Court has also held that a "search" occurs when an expectation of privacy that society is prepared
to consider reasonable is infringed. United States v. Jacobsen, 466 U.S. 109, 113 (1984). We
begin our analysis by asking if appellant had a reasonable expectation of privacy in the dirt found
in the bed of his truck.



a) Privacy Interest in Dirt


 Appellant must first persuade us that the dirt removed from the bed of his truck is
covered by the Fourth Amendment's protection of personal "effects." See Cardwell v. Lewis, 417
U.S. 583, 591 (1974) (Fourth Amendment has traditionally been deemed to protect "personal
effects"). If personal effects encompass dirt particles, we next ask if appellant demonstrated any
efforts to preserve the dirt as private. If so, we must determine if his subjective expectation of
privacy is one that society is prepared to recognize as reasonable or justifiable under the
circumstances. See Katz v. United States, 389 U.S. 347, 349-50 (1967) (instructing us to
propound the final two questions to determine a legitimate expectation of privacy).

 Cardwell involved the warrantless seizure of an automobile from a public parking
lot after its owner's arrest for murder. Police compared casts made of tire tracks at the scene of
the murder and foreign paint samples found on the victim's car with tire treads observed and paint
scrapings taken from the defendant's car. The Court determined that "no personal effects, which
the Fourth Amendment traditionally has been deemed to protect, were searched or seized and
introduced in evidence." Id. at 591. The paint scrapings taken from the car were not personal
effects; we find even less reason to consider dirt particles to be personal effects. 

 A New Jersey court relied on Cardwell to find "no suggestion that dirt, debris and
the like on the floor or surface of a car would be attended by an expectation of privacy or would
implicate a car owner's proprietary or possessory interests." State v. Reldan, 495 A.2d 76, 82
(N.J. 1985). In Reldan, the defendant objected to evidence obtained by vacuuming the floor of
his car; the dirt and debris contained evidence of drug use. The New Jersey Supreme Court found
the vacuuming did not constitute a search because the dirt and debris could not be considered
personal effects protected by the Fourth Amendment. "Moreover, none of the materials seized
and subjected to microscopic examination could reasonably have been considered the personal
effects or private property of the defendant. They were common detritus--samples of dirt, debris,
hair, and the like." Id. at 83. 

 We rely on Reldan and Cardwell to hold that samples of dirt are not effects within
the meaning of the Fourth Amendment. Jacobsen defines constitutionally protected effects as
those "in which the public at large has a legitimate expectation of privacy." Jacobsen, 466 U.S.
at 114. We conclude the public has no legitimate expectation of privacy in dirt. The dirt removed
from appellant's truck did not serve to reveal matters of a personal nature relating to appellant's
privacy. "The concept of an interest in privacy that society is prepared to recognize as reasonable
is, by its very nature, critically different from the mere expectation, however well justified, that
certain facts will not come to the attention of the authorities." Id. at 122; see also Andreas, 463
U.S at 771; United States v. Knotts, 460 U.S. 276, 280-81 (1983); Smith v. Maryland, 442 U.S.
735, 739-41 (1979); Terry v. Ohio, 392 U.S. 1, 9 (1968).

 Our opinion that the removal of dirt samples from appellant's truck bed did not
constitute an impermissible search is bolstered by the lack of any evidence of appellant's
subjective expectation of privacy. Appellant made no attempt to conceal the dirt by placing it in
a closed container; rather, it was exposed to public view in the open bed of his truck. "[T]he
manner in which a person has attempted to shield an item's existence and identity from public
scrutiny will usually be the key to determining whether a reasonable expectation of privacy has
been violated." Jacobsen, 466 U.S. at 142 (Brennan, J. dissenting). "What a person knowingly
exposes to the public . . . is not a subject of Fourth Amendment protection. . . .  But what he
seeks to preserve as private, even in an area accessible to the public, may be constitutionally
protected." Katz, 389 U.S. at 351-52.

 Appellant had no privacy interest in the dirt both because it is not an effect and
because he made no attempt to keep it private:  "Lowered privacy expectations, however, may
nevertheless justify a search of areas and things with respect to which a person would not
ordinarily have any personal possessory or proprietary interest." Reldan, 495 A.2d at 82. We
hold that the warrantless removal of dirt samples from appellant's truck bed did not violate the
privacy interests protected by the Fourth Amendment. 


(b) Subsequent Testing an Unreasonable Search?

 The appellant further argues that the subsequent testing of the dirt was itself an
unreasonable search. We disagree because none of the dirt seized and subjected to examination
could reasonably have been considered his personal effects or private property. Though it is not
controlling, we are persuaded again by the reasoning of Reldan, that "[i]f subsequent testing of
items lawfully seized does not serve to reveal matters of a personal nature relating to an
individual's privacy, it will not be deemed an unreasonable search." Reldan, 495 A.2d at 83. 
Here, as in Reldan, the testing of the dirt samples seized from the bed of the truck did not
independently expose appellant's personal affairs or private life. "Consequently, because the
microscopic analysis of this material could not serve to reveal any matters of an especially
personal nature, it cannot be considered a search that trenches upon protectable privacy interests." 
Id.

 The significance of the testing in this case may be contrasted with that in State v.
von Bulow, 475 A.2d 995 (R.I. 1984). There the subsequent governmental testing of
pharmaceuticals represented "a significant expansion of the private search because it positively
identified the unknown composition of the pills." Id. at 1018. The testing served to reveal the
identity of the pills, a matter of individual privacy. See Reldan, 495 A.2d at 84.

 In the present case, appellant has demonstrated no expectation of privacy in the soil
that was tested. Moreover, the subsequent testing of the dirt did not serve to reveal any matter
of individual personal privacy. We hold that the testing itself did not therefore constitute an
impermissible search under the Fourth Amendment.


2) State Prohibition Against Unreasonable Search and Seizure


 Article 1, section 9 of the Texas Constitution provides that "The people shall be
secure in their persons, houses, papers and possessions, from all unreasonable seizures or
searches." Tex. Const. art. I, § 9. The court of criminal appeals has recognized that this
protection is similar in all respects to the protection offered by the Fourth Amendment. See
Heitman v. State, 815 S.W.2d 681, 683 (Tex. Crim. App. 1991). Previously, we have looked
to federal constitutional law to determine which searches and seizures offend our state
constitution. Texas courts have held that the Texas safeguard against arbitrary invasion by the
government is not more restrictive than the Fourth Amendment of the United States Constitution, 
Garcia v. State, 676 S.W.2d 202 (Tex. App. 1984, pet. ref'd), and does not offer any greater
protection than the United States Constitution. Salazar v. State, 806 S.W.2d 291 (Tex. App.
1991, no pet.).

 We are aware that the court of criminal appeals has recently commented upon the
State's right, under federalism principles, to provide constitutional protections to its citizens in
addition to those afforded under the federal constitution. See Heitman, 815 S.W.2d at 690. 
Clearly, the federal constitution represents the floor for individual rights, while the State
constitution may establish the ceiling. Id. Recognizing this principle, we nevertheless have found
no Texas opinions before or since Heitman that would grant to this appellant any broader state
protection against the seizure and testing of the dirt in the bed of his pickup than he would be
afforded under the Fourth Amendment. We conclude that dirt is not a "possession" afforded
protection under the Texas constitution. We overrule the second point of error.


3) Harmless Error


 Even if appellant had a privacy interest in the dirt that we have failed to discern,
we believe the tainted soil samples would be cumulative of other evidence connecting appellant
with hexazinone, the poison found in the ailing Treaty Oak. In determining whether error is
harmless, see Tex. R. App. P. Ann. 81(b)(2) (Pamph. 1992), we are not to focus on the propriety
of the outcome of the case, but instead should be concerned with the integrity of the process
leading to the conviction. Harris v. State, 790 S.W.2d 568, 587 (Tex. Crim. App. 1989). 
Factors the Court should consider include: (1) the source of the error; (2) the nature of the error;
(3) whether or to what extent it was emphasized by the State; (4) the error's probable collateral
implications; (5) how much weight a juror would probably place on the error; and (6) whether
declaring the error harmless would encourage the State to repeat it with impunity. Harris, 790
S.W.2d at 587.

 Procedurally, we must first isolate the error and all its effects, using the
considerations set out above and any other considerations suggested by the facts of the cause. 
Second, we must ask whether a rational trier of fact might have reached a different result if the
error and its effects had not occurred. Id. at 587-88. We do not focus primarily on the weight
of the other evidence of appellant's guilt, but instead focus on whether the error might possibly
have prejudiced the jurors' decision-making. In other words, our responsibility is to determine
whether the trial was an essentially fair one. Id.

 At trial, the State introduced into evidence tape recordings it had made of
conversations between the appellant and State's witness Cindy Blanco. In those recordings, the
appellant discussed his acts that led to the destruction of the Treaty Oak. In addition, Blanco
testified that during her daily rides with appellant to a methadone clinic, he began to drive around
looking for a "special" oak tree. The witness related that during this period of time she saw some
containers labeled "Velpar" (Velpar is a commercial brand name for hexazinone) in the back of
appellant's truck. During one instance, the witness remarked to the appellant that she would "like
to shake the hand of the dumb, stupid guy that did this to the tree," whereupon the appellant "put
out his hand and said `meet the dumb, stupid guy that did that to the tree.'" The witness further
testified that the appellant told her he was deliberately killing the tree and was doing so in revenge
for the State's having made him work at planting and tending to trees and for other reasons
relating to his frustrated romantic aspirations toward his methadone counselor. 

 Applying the harmless-error standard and recognizing that cumulative evidence can
be a factor to be considered, we conclude beyond a reasonable doubt that the introduction of the
evidence of the dirt obtained from the appellant's truck and its subsequent testing did not
contribute to the appellant's conviction or punishment. It was merely cumulative of other
evidence already admitted during trial. In light of this circumstance, we think that error, if any,
surrounding the seizure and analysis of the dirt samples would have, beyond a doubt, made no
contribution to appellant's conviction or punishment. See Tex. R. App. P. Ann. 81(b)(2) (Pamph.
1992).



EVIDENCE TREE WAS "DESTROYED"


 In his third and final point of error, appellant claims that his conviction rests upon
a theory unsupported by the evidence. His claim centers around the meaning of the word
"destroyed" as used in the jury charge:



[I]f you believe . . . that . . . Paul Stedman Cullen . . . did then and there
intentionally or knowingly damage or destroy tangible property . . . you will find
the defendant guilty of the offense. . . .



(Emphasis added). Appellant argues that because he was indicted for damaging and destroying
the Treaty Oak, the State must prove that he did, in fact, destroy the tree. Because the evidence
shows that at least one-third of the tree survived his chemical attack, appellant argues that the tree
has only been damaged, not destroyed, and thus his conviction is not supported by the evidence. 
We disagree. 

 The criminal mischief statute is worded disjunctively to allow for prosecution if a
person "damages or destroys" tangible property... ." See § 28.03(1) (emphasis added). The
charge submitted to the jury was worded disjunctively, even though the indictment was worded
conjunctively. A conjunctive pleading will support a disjunctive submission to the jury. 
Zanghetti v. State, 618 S.W.2d 383, 387-88 (Tex. Crim. App. 1981); Knorpp v. State, 645
S.W.2d 892, 904 (Tex. App. 1983, no pet.). Thus the State was required to show that appellant
either damaged or destroyed tangible property. However, we believe the evidence supports
appellant's conviction for destroying as well as damaging the tree. 

 The appellant, the State, and the trial court all agreed that "destroy" is not
statutorily defined. It follows that the term's meaning should be determined by its common usage. 
See Tex. Gov't Code. Ann. § 311.011 (1988). Appellant and the State have provided us with
dictionary definitions of the word "destroy." We have consulted our own dictionaries as well. (2)

 After reviewing all of these definitions, we believe that a jury could find that the
Treaty Oak had been "destroyed," notwithstanding the fact that, at the time of trial, one-third of
the tree contained less than toxic amounts of the chemical herbicide. We conclude that "destroy"
could refer to total or partial destruction. The record contains testimony that, at the time of trial,
the destruction to the Treaty Oak's canopy exceeded fifty percent and that this destruction was
increasing. There was expert testimony that a tree that has lost more than fifty-percent of its
canopy may be considered a total loss. (3) 

 When reviewing the sufficiency of the evidence supporting a conviction, the court
must view all of the evidence in the light most favorable to the prosecution and determine whether
any rational trier of fact could have found the essential elements of the offense charged beyond
a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); Butler v. State, 769 S.W.2d
234, 239 (Tex. Cr. App. 1989). We believe the evidence in the record supports the jury's
determination that appellant's chemical attack on Treaty Oak destroyed the tree. We overrule
appellant's third point of error.


CONCLUSION



 Finding no error, we affirm the conviction.


 

 Bea Ann Smith, Justice

[Before Chief Justice Carroll, Justices Aboussie, and B. A. Smith]

Affirmed

Filed: June 24, 1992

[Publish]
1. Unless otherwise noted, all statutory cites are to the Texas Penal Code. 
2. Our own dictionaries define the term as follows:


 "Destroy:  1. to reduce (an object) to useless fragments, a useless form, or remains, as by
rending, burning, or dissolving; injure beyond repair or renewal." 


The Random House Dictionary of the English Language 540 (2d. ed. 1987). Consider also the
following definition: 


 "Destroy: to ruin completely; spoil so that restoration is impossible."


The American Heritage Dictionary of the English Language 358 (1973).
3. Expert testimony revealed that a tree's canopy (or crown) constitutes the "food-making"
portion of the tree itself. If the canopy is reduced, the tree makes less food for itself. This in
turn has the effect of continuously impeding the tree's growth, and eventually causing the tree
to starve to death.