# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4860-18T2

A.C.,

    Plaintiff-Appellant,

v.

C.D.,

    Defendant-Respondent.

_____

Submitted June 2, 2020 – Decided June 17, 2020

Before Judges Fisher and Rose.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Union County, Docket No. FV-20-0440-19.

Legal Services of New Jersey, attorneys for appellant (Shoshana E. Gross and Mary M. Mc Manus-Smith, of counsel and on the brief).

Antonelli Kantor PC, attorneys for respondent (Daniel Antonelli, of counsel and on the brief).

PER CURIAM

In this appeal of the custody aspect of a domestic violence final restraining order, we conclude the trial judge erred by allowing the children's aunt to retain residential custody – which she obtained temporarily only as a result of the chaos triggered by the domestic violence incident and its aftermath – instead of conducting a plenary hearing to explore whether it was better for the children to live with their father. We, thus, remand for a plenary hearing.

Plaintiff A.C. (Andrew) and defendant C.D. (Carol)[1] filed complaints against each other under the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -35, alleging predicate acts arising from the same incident in their Elizabeth apartment on September 21, 2018. By this time, the parties had lived together for four years and were the parents of two children.[2] Their living situation was then in flux; they were to be evicted the following month.

After the incident that prompted their domestic violence complaints, police were called, Andrew left the premises to reside with friends in Little Egg Harbor, and Carol's sister – M.G. (Megan) – took the children to her home in Roselle. The next day, September 22, Carol overdosed and was hospitalized, an

---

[1] All names used are fictitious to protect the participants' privacy interests.

[2] The children were born in June 2016 and October 2017.

A-4860-18T2

event that prompted the Division of Child Protection and Permanency's involvement.

On September 26, 2018, the unrepresented parties appeared in court on these matters for the first time. Carol had been released from the hospital's psychiatric ward that same morning. After hearing separately from the two parties about the alleged acts of domestic violence – they both alleged they were assaulted and harassed by the other – the judge entered temporary restraining orders in favor of both and scheduled a final hearing date. In considering the children, the judge took telephonic testimony from a Division caseworker, who testified she had met with both parties and that it appeared to her, when she met with Andrew and the children, that "the children were safe in the[ir] father's care." The caseworker also said that "both parents can parent the children [b]ut [Carol] would need some assistance at this time with her sister." She testified the Division: was aware of Andrew's decision to move to Little Egg Harbor to live with a couple he had known for many years; had not yet done an assessment of the Little Egg Harbor home or the couple; understood that Carol would be residing with Megan; and that Megan's home had been assessed and approved. Because both parties' living arrangements were not deemed stable, the judge decided not to disturb the temporary arrangement unilaterally put in place by

Carol the night of the domestic violence incident.[3]  So, residential custody[4] of the children was temporarily placed with Megan; because Carol would also be residing in that home, the judge asked Megan to agree to supervise Carol "24/7." Andrew was permitted supervised visitation.

The judge made it clear that this arrangement was only temporary:  "I'm just giving you residential custody[, Megan].  Obviously it's from now till October 11th."  Andrew did not object to this arrangement, perhaps because it was designed to last only for the fifteen days between then and the final hearing.

On October 11, 2018, both parties appeared for the final hearing before a different judge.  Carol, who was without counsel, as was Andrew, asked for an adjournment so she might retain an attorney.  The judge reviewed the circumstances of the earlier proceeding, noted that some but not all information about its continuing investigation had arrived from the Division, and adjourned the final hearing for three weeks.

---

[3]  We note that the judge heard each party's testimony when the other was outside the courtroom.  It also appears from the transcript that the testimony of the Division representative was heard when Andrew was outside the courtroom; no apparent effort was made to allow him to be in the courtroom during that testimony.

[4]  The parents continued to share joint legal custody.

4

On November 1, 2018, the parties appeared for the rescheduled final hearing. Andrew was with counsel, Carol was not, but she did not immediately seek another adjournment. After the judge advised the parties of the nature and potential consequences of domestic violence proceedings, Carol again sought an adjournment to retain counsel. The judge granted that request, as well as Andrew's request to add a claim of false imprisonment to his domestic violence complaint. Through counsel, Andrew also sought greater visitation than previously permitted and questioned the need for supervised visitation, arguing the TRO's supervision requirement was mistaken and that it was Carol who needed supervision. This argument morphed into consideration of the temporary residential custody situation, Andrew arguing that the children should reside with him. Apparently because the Division wanted these parents to undergo substance abuse and psychiatric evaluations, the judge viewed the uncertain circumstances as a reason to leave things unchanged, saying, "it[] [would] be improvident of me to change the status quo until I have such reports in my hand."

Two more weeks passed. By the time of the November 15, 2018 final hearing, Carol still had not retained counsel; this time she did not seek a further adjournment, so the hearing took place. The judge heard from both parties as well as from Megan, and K.P. (Ken). Andrew had lived with Ken and his wife

in Little Egg Harbor since the September 21 incident. Andrew and Carol testified about the alleged acts of domestic violence. The testimony from Megan and Ken was limited. Megan testified briefly about the marks she saw on Carol immediately after the domestic violence incident, as well as her claim that Andrew, on an earlier occasion, was "verbally abusive" toward Carol. Megan also testified that, after the incident in question, she learned from Andrew that he intended to pursue a restraining order, and that she relayed that information to Carol. Ken testified only about the bruises and marks he saw on Andrew the night of the domestic violence incident.

The judge made thorough factual findings on each party's claim against the other and about the September 21 incident that prompted their complaints. He found Andrew more credible than Carol, but he also concluded that neither engaged in harassment as defined in any of the subsections of N.J.S.A. 2C:33-4. He found instead that each had assaulted the other. N.J.S.A. 2C:12-1. The judge also found Carol committed the predicate act of false imprisonment, N.J.S.A. 2C:13-3, during that incident.

Having recognized that the parties' relationship fell within the Act's scope because they resided in the same household and had children in common, see N.J.S.A. 2C:25-19(d), and that each assaulted the other, thereby committing

6 <span>A-4860-18T2</span>

predicate acts, N.J.S.A. 2C:25-19(a)(2), the judge considered the final prong in such matters: whether a final restraining order (FRO) was necessary to protect the victim from an immediate danger or to prevent further abuse. See Silver v. Silver, 387 N.J. Super. 112, 127 (App. Div. 2006). In applying that last prong to the facts he found, the judge determined that Carol was not in need of an FRO because she was not in fear of Andrew as evidenced by the communications she sent to Andrew after the assault; in fact, the judge was convinced that Carol only sought a restraining order to counter Andrew's attempt to seek one, as he had told Megan was his intention. On the other hand, the judge concluded that Andrew was in need of an FRO because Carol's past actions had caused him to lose a job; he also found that Andrew had reason to have a "fear [of] further acts of domestic violence, further phone calls, harassments, further interference with his employment, further interference with his life" and, so, the judge entered an FRO in Andrew's favor and against Carol. Neither party contests any of these findings or determinations.

Instead, once the judge made his findings, the focus immediately turned to and has ever since remained on the issue of residential custody. Andrew's counsel again asserted – the moment the judge finished uttering his findings – that Andrew was entitled to custody, reprising the argument from earlier

A-4860-18T2

proceedings that "[h]e's the victim[, and] [t]here's a presumption of custody [going] to the victim." In response, the judge noted that the Division was involved and had yet to complete its investigation. And while counsel argued that Andrew had established a place to live with Ken and his wife in Little Egg Harbor, that he was employed, and that he had fully responded to all the requests of the Division, which had expressed no concerns about Andrew, the judge determined it was appropriate to order a best interest evaluation and to await the Division's evaluations of both parties' living arrangements. For those reasons, the judge refused to disturb the existing arrangement that had the children residing with Megan, who had also taken in Carol. This was memorialized in the FRO, which stated that "custody subject to best interest, custody shall be under the supervision of [Megan] pending court determination of custody."

The parties returned to court on December 6, 2018, in anticipation of the resolution of the pending issues. But because all anticipated reports had not arrived, little was accomplished except for the further refining of visitation for Andrew, who, through counsel, again argued he should be given residential custody in the interim because the "starting point" in resolving such a dispute was a presumption of entitlement to custody in his favor, particularly when compared to the fact that Megan was "not a biological parent." The judge

rejected this, stating that the starting point should be a maintenance of "the status quo pending" receipt of the outstanding reports.  In the midst of the colloquy, the judge referred to one report, stating without specificity that it contained "issues . . . regarding attitudes and whatnot."  Andrew's counsel argued that the writer of that report only expressed suppositions and what the writer believed "may happen" if Andrew received residential custody[5]; moreover, Andrew relied on the fact that the Division investigation had not resulted in any concerns about Andrew or his living arrangements.  Opting for preserving what he viewed as the status quo, the judge refused to disturb the temporary custody arrangement; he did amend the FRO to provide for Andrew's payment of child support and further adjusted Andrew's visitation rights.

The parties next appeared in court on January 10, 2019, when Carol applied for an order curtailing Andrew's visitation rights on the allegation that Andrew had not complied with previously imposed visitation conditions.  The judge rejected that assertion and denied relief.

The next appearance was on February 28, 2019, at which time the judge, who had presided over the final domestic violence hearing and all proceedings

---

[5]  The record is unclear as to the identity of the report referenced.  It also is not in the record on appeal.

A-4860-18T2

since, advised the parties he was required to recuse himself because of a past relationship with the attorney just retained by Carol. Because this unexpected event was seen as the likely cause of additional delay, Andrew's counsel urged the judge, despite his recusal, to turn residential custody over to Andrew because he "is a victim of domestic violence," which carries "a strong presumption that the best interest of the children are served by being in his custody." The judge rightly refused to enter any order in light of his recusal.

The parties next returned to court – this time before the judge who heard the parties' applications for temporary restraining orders six months earlier – on March 28, 2019. The judge advised the parties that while the evaluators had taken all steps, "[t]he report is just not complete yet." Andrew insisted on his entitlement to residential custody, urging again the presumption in his favor as a victim of domestic violence; he also argued that the Division had raised no concern about him. The judge made no change; she entered an order that required, among other things, the production within twenty days of the best interest evaluation as well as a status report from the Division.

These materials were eventually provided to the court, and the parties appeared on May 28, 2019, to finally resolve the FRO's custody component. What they got instead was a decree – without a hearing or proofs – that the

10

temporary arrangement that started nine months earlier when Megan took the children to her home for the night after the domestic violence incident had become the "status quo," which the judge would not consider altering until such time as either parent applied for residential custody "with a comprehensive plan via written motion."

In short, after all this time, no hearing occurred, no testimony taken, and no findings were made. As the transcript reveals, and as the amended FRO states, the judge based her decision only on the written reports; the individuals who supplied information for that report or who rendered opinions contained n that report were not called to testify or required to submit to cross-examination. Indeed, the reports relied on by the judge were not even marked for identification, and they do not appear in the record on appeal.

Properly viewing this domestic violence action as having finally reached a point of finality, Andrew filed this appeal, arguing the judge: (1) failed to apply "the statutory presumption and award custody to [Andrew] after he was found to be the victim of domestic violence"; (2) erred in granting residential custody to a third party instead of the children's parent; (3) deprived Andrew of due process by granting residential custody to Megan without Megan having filed a complaint or a motion, without a plenary hearing, and with undue reliance

on Andrew's child-support payment record; and (4) improperly imposed on Andrew an obligation to undergo "a battery of evaluations" despite the absence of evidence that the children were unsafe in his care. We agree with much of what Andrew argues in his second and third points as well as parts of his other points; accordingly, we remand the matter for a plenary hearing.

Most obvious among the defects in the trial court's ruling is the deprivation of Andrew's right to a plenary hearing. In rejecting Andrew's arguments, the judge relied only on a report prepared by one or more absent and unnamed individuals. The report was not identified or put in evidence, the materials gathered or interviews conducted that formed the basis for the report were not identified, the report's authors were not called to testify or subjected to cross-examination, and the report's content was not placed on the record.[6] The judge relied only on the report's out-of-court assertions and rejected Andrew's attempts to dispute whatever the report contained. There is no question but that in these circumstances Andrew was entitled to a hearing, and the judge erred by refusing to conduct one. See, e.g., J.G. v. J.H., 457 N.J. Super. 365, 372-74 (App. Div. 2019).

---

[6] The report is also not in the appellate record.

We could stop here, but we think it would also be helpful to discuss some of the other obstacles the judge placed in front of Andrew. First, Andrew correctly argued then and argues now that the judge's unwillingness to disturb the status quo misapprehended the fact that the residential arrangement left in place was only intended to be temporary – only from the entry of the TROs on September 26, 2018, until the October 11, 2018 final hearing then scheduled – and it was perpetuated only because of delays caused by Megan and by the delay caused by the court's interest in an evaluation that was slow in arriving. The judge's only response was that if Andrew was aggrieved, he should have appealed. The fact is, however, that the orders entered up until this last hearing were interlocutory as each custody disposition was temporary and anticipated a final disposition at a later date. Andrew could not file an appeal as of right because finality had not been achieved. He would have had to move for leave to appeal; such relief, however, is only sparingly granted, State v. Reldan, 100 N.J. 187, 205 (1985), and would not likely have been granted.[7]

---

[7] We think it is highly likely that if Andrew so moved after any one of the earlier proceedings we would have denied leave to appeal because, in each instance, a final disposition of the custody component of the domestic violence proceeding – presumably after a plenary hearing – seemed right around the corner. It would not have made sense for this court to enjoin that eventuality for the purpose of determining whether it was error for the judge to deny him interim relief.

13

Second, the judge seems to have denied Andrew residential custody because Andrew was apparently in arrears on his child support obligation. It was well-established long ago that just as a parent retains the obligation to support a child who may not desire a relationship with the parent, Martinetti v. Hickman, 261 N.J. Super. 508, 513 (App. Div. 1993), a parent's right to the love and companionship of a child (and vice versa) must not be withheld simply because of unpaid child support, Daly v. Daly, 39 N.J. Super. 117, 123 (J. & D.R. Ct.), aff'd, 21 N.J. 599 (1956). Yet, the judge mentioned Andrew's failure to pay child support repeatedly throughout the May 28, 2019 hearing.

Third, there is no doubt that the only parent of these children who sought residential custody was Andrew. Carol's attorney acknowledged this; when the judge asked whether Carol was seeking custody, Carol's attorney said, "we're not." So, the dispute was one between the child's other parent – Andrew – and a non-parent, the child's aunt. In ruling against the natural parent, the judge seems to have given little or no consideration to Andrew's constitutional right to the care and companionship of his children. Santosky v. Kramer, 455 U.S. 745, 753 (1982); In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999); Wilke v. Culp, 196 N.J. Super. 487, 496 (App. Div. 1984). Megan's position with respect to these children pales in comparison to Andrew's. Indeed, Megan never

sought custody; she never filed a complaint for custody and never filed a motion in this action seeking such relief. And yet the judge allowed the indefinite maintenance of that temporary arrangement even beyond the extraordinary nine months that had already elapsed. And all without ever conducting a plenary hearing.

Fourth, the judge erred by failing to fully consider the realities of her decision. While the judge adamantly expressed a disinclination to grant residential custody to Carol, she indirectly allowed that very thing to occur. By leaving unchanged the temporary arrangement that commenced when the domestic violence complaints were filed nine months earlier, the judge left the children in Megan's home where Carol also resides. To repeat, Carol did not seek custody, and the judge insisted "[Carol] is not walking out of this courtroom today with custody of these children," and yet, by allowing Megan to maintain residential custody of the children, the judge in essence awarded Carol – who was living with Megan – de facto residential custody. So, the one parent who expressly declined to seek relief indirectly obtained residential custody, while the only parent seeking custody was denied relief and wasn't even allowed to testify or participate in a hearing on that subject.

A-4860-18T2

The fifth aspect of these proceedings that we should discuss concerns Andrew's repeated assertion that, as a parent who was awarded a domestic violence FRO against the other parent, he was entitled to a presumption in his favor on the custody issue. To be sure, the Act declares that an FRO may encompass an order "awarding temporary custody of a minor child," but the presumption is somewhat different than what Andrew repeatedly argued. The Legislature did not say that the presumption belongs to a victim of domestic violence; the presumption is awarded only to "the non-abusive parent." N.J.S.A. 2C:25-29(b)(11). As noted, the judge found that both parties committed acts of domestic violence in that they each assaulted the other; in short, they were both abusers. Carol was denied an FRO only because the judge found that Carol did not require an FRO, not because of any finding that Andrew was not an abuser.

* * *

To summarize, the judge erred in concluding, without a hearing and proper factfinding, that Andrew was not entitled to residential custody of the children. We thus remand for a plenary hearing. Because the temporary arrangement had existed longer than expected by the time the order under review was entered, and now another year has gone by since the erroneous disposition, we direct the conducting of the hearing as soon as possible.

A-4860-18T2

That part of the May 28, 2019 amended FRO that denied Andrew's request for residential custody is vacated and the matter remanded for further proceedings in conformity with this opinion.  The restraints contained in the FRO, as well as all other aspects, remain in place.

Vacated in part and remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-4860-18T2