**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0888-24

RONALD BOGER,

    Plaintiff-Appellant,

v.

IDEAVILLAGE PRODUCTS
CORP., ANAND KHUBANI, and
DONALD BESHADA, ESQ., an
Attorney at Law in the State of New
Jersey,

    Defendants-Respondents.

_____

Submitted September 23, 2025 – Decided November 3, 2025

Before Judges Gooden Brown and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-0993-24.

Kang Haggerty, LLC, attorneys for appellant (Ralph P. Ferrara and Aaron L. Peskin, on the briefs).

Gibbons PC, attorneys for respondents IdeaVillage Products Corp. and Anand Khubani (Christine A. Amalfe, Cassandra J. Neugold and Zachary B. Posess, on the brief).

Donnelly Minter & Kelly, LLC, attorneys for respondent Donald Beshada (Jason A. Meisner and Joseph P. Fiteni, of counsel and on the brief).

PER CURIAM

Plaintiff Ronald Boger appeals from the October 11, 2024 Law Division order compelling arbitration of his claims against defendants IdeaVillage Products Corp. (IDV) and Anand Khubani, and all but his legal malpractice and negligence claims against defendant Donald Beshada, which the motion court stayed pending the outcome of the arbitration. We affirm.

## I.

IDV creates, markets, manufactures, and sells consumer brands and products. Khubani is the founder and Chief Executive Officer of IDV. Beshada has been IDV's outside general counsel since 2011.

Plaintiff is a corporate sales executive. He began his career in 1970 as an industrial sales trainee for a hardware distribution company. At that firm, plaintiff rose to the level of senior buyer and head of housewares. He then served as Vice President of Purchasing at Professional Hardware Distributors for fourteen years. There, he "controlled all the inside corporate relationships" and negotiated the terms of purchasing agreements with houseware companies.

In 1993, plaintiff was recruited by a New York-based private equity firm to be Vice President at Eagle Food Centers (EFC). He negotiated his executive compensation agreement for that position. Plaintiff left EFC in 1996 to become Vice President of Sales at Telebrands Corp. (Telebrands), a television marketing company, where he "manage[d] the company's retail operations." Plaintiff credits himself for significant financial growth at Telebrands, where he "helped create a purchase and retail sales business plan . . . he presented to a factoring company to procure corporate financing," and increased the company's equity value from negative $12 million to positive $6 million in two years.

In 1998, plaintiff was recruited to be President of Major Connections (MC), a software company. He negotiated an executive compensation agreement with MC. He was responsible for "[m]anaging a turnaround of the company" to recover from significant financial issues.

Plaintiff met Khubani sometime around 1996, when they both worked for Telebrands. In 2000, plaintiff accepted Khubani's offer to join IDV, which Khubani founded two years earlier, as Executive Vice President (EVP) of sales.

Approximately one year later, plaintiff left IDV to "run the sales department" at a new enterprise. After two years, plaintiff was recruited by

A-0888-24

Harvey Lewis Designs to increase the company's revenues and profits during a period of financial turmoil.

In December 2006, plaintiff rejoined IDV as an EVP after negotiating an executive compensation agreement with Khubani. Plaintiff was tasked with "helping to run the company" and managing IDV's sales department. His responsibilities included: "improving current item/brand revenues," "cleaning up dead inventories," "launch[ing] Slim Shots," an IDV product, "conduct[ing] internal management meetings," "travel[ing] with Khubani for major retail presentations and new item acquisition trips," "personally present[ing] corporate sales presentations to the sales staff and internal staff," and "manag[ing] all corporate sales and inventory products." By his own account, plaintiff's responsibilities included "retailer negotiations" and "playing a major role in new item acquisitions and negotiations."

In 2011, Khubani promoted plaintiff to President and Chief Operating Officer (COO). At that time, plaintiff's responsibilities were expanded to include "corporate sales and profits," "management and projection of warehouse operations," and "management of purchasing for domestic and international."

In 2013, plaintiff advised Khubani he intended to leave IDV unless he received additional compensation. Plaintiff and Khubani negotiated a new

A-0888-24

agreement, the final terms of which were memorialized in a handwritten document (the 2013 Compensation Agreement). The 2013 Compensation Agreement provided, for the period January 1, 2014, to December 31, 2018, plaintiff would receive: (1) a salary of $300,000 per year; (2) one percent of the first $20 million of net profit; (3) two percent of net profit over $20 million; (4) three percent of the profit on the sale of any brands owned by IDV; and (5) a $500,000 retention bonus.

Following execution of the 2013 Compensation Agreement, plaintiff's responsibilities expanded and he "became the internal person for corporate issues, involved with marketing and direct response projections, [and] provided input to the monthly [c]orporate account meetings." Plaintiff also "directed the launch of the Flawless brand, played a major role in presentations to sell the Flawless brand, managed retailers for Flawless inventories to ensure a successful full brand sale, and upon sale, [took] responsibility for directing and managing projections and communications with" Church and Dwight Co. (C&D), the entity that purchased the Flawless brand from IDV.

During his tenure, plaintiff analyzed complex business agreements, including reviewing choice-of-venue and indemnification clauses in contracts. All IDV sales agreements were reviewed by plaintiff. IDV "grew exponentially"

5

when plaintiff was President. By 2017, the company "had approximately annual profits of $40 million and employed approximately forty employees."

The 2013 Compensation Agreement expired on December 31, 2018. In January 2019, Khubani emailed plaintiff with proposed terms for a new agreement. Under the proposal, plaintiff would remain as President and COO from January 1, 2019, to December 31, 2021, earning a salary of $300,000 per year. In addition, he would receive: (1) a bonus of one percent of net profit up to $20 million; (2) a bonus of two percent of net profit exceeding $20 million; and (3) up to $7.5 million in contingent bonuses on C&D's purchase of the Flawless brand (the C&D Deal).[1]

Over the following five months, plaintiff negotiated the terms of a new executive compensation agreement, sometimes directly with Khubani, and other times through Beshada, who plaintiff described as Khubani's "consigliere."[2] On February 28, 2019, plaintiff emailed Beshada to propose three alternative compensation structures, each proposing plaintiff earn at least $5 million.

---

[1] The first amended complaint alleges the C&D Deal was finalized in May 2019, and "provided that C&D would pay [IDV]: (1) $475 million at closing; and (2) an earn-out payment of up to $425 million if certain sales figures were met on the sale of Flawless Brand products post-closing."

[2] Cambridge Dictionary defines consigliere as an "advisor" or "counselor." See https://dictionary.cambridge.org/us/dictionary/italian-english/consigliere.

A-0888-24

In March 2019, the agreement had not yet been finalized. Plaintiff advised Beshada he was considering retaining an attorney to help him finalize the negotiation of his new executive compensation agreement. Thereafter, plaintiff emailed Beshada new proposed terms with a $3.5 million payout and additional benefits, including an apartment in Edgewater, and company-paid travel expenses from his home in Florida to New Jersey. Plaintiff expected Beshada to present the offer to Khubani.

In April 2019, plaintiff emailed Beshada another proposal to present to Khubani. On April 12, 2019, plaintiff emailed Khubani and Beshada and told them the "continual negotiations" had caused him to have an abnormal EKG, and his wife no longer wanted him to negotiate on his own behalf. Plaintiff withdrew his prior offers and advised he was "going to hire a lawyer/advisor" to represent him during negotiations. Around that time, plaintiff consulted with a retired Superior Court judge but ultimately did not retain him as counsel.

In April 2019, plaintiff and Khubani reached a verbal agreement on a new compensation agreement. The terms of the contract were memorialized in a formal, five-page typewritten document (the 2019 Compensation Agreement). Under the terms of the agreement, plaintiff was to receive: (1) $4 million on or before June 15, 2019; (2) an additional $1 million by June 15, 2020; (3) annual

7

compensation of $1 million until the expiration of the agreement on December 31, 2021; and (4) an additional $7 million if IDV met the full earn-out on the C&D Deal.

The 2019 Compensation Agreement contained an arbitration provision (Arbitration Provision) which states:

> If a dispute arises between the Parties related to this Agreement, all such disputes shall be submitted to binding arbitration, under the rules currently set forth by the American Arbitration Association (the "AAA"), including any Rules that relate to appeals of any rulings and/or decision of the arbitrator and/or AAA. The Parties agree that any dispute shall be hand[l]ed by a single arbitrator, to be agreed to by the Parties, or, if the Parties are unable to agree, to be appointed by the AAA, whose decisions will be binding on the Parties, with the exception of any rights to appeal any award consistent with the Rules of the AAA. The Arbitration shall be governed by New Jersey law, and the hearing shall take place in or around Wayne, New Jersey. The parties specifically agree to New Jersey jurisdiction and venue for the arbitration.

On May 31, 2019, plaintiff and Khubani executed the 2019 Compensation Agreement. Both parties initialed every page of the agreement, indicating each had read and agreed to its terms.

On February 4, 2020, after further negotiations initiated by plaintiff, he and Khubani amended and re-initialed Section [Three] of the 2019

Compensation Agreement, which is on the same page as the Arbitration Provision. The amendment provides plaintiff an additional $1 million bonus.

On or around December 31, 2021, when the 2019 Compensation Agreement expired, plaintiff retired from IDV after being paid all the compensation due to him under the agreement.

On September 17, 2022, more than eight months after IDV had fully performed under the 2019 Compensation Agreement, plaintiff filed a six-count complaint in the Law Division. Plaintiff named IDV and Khubani as defendants and alleged he had been fraudulently induced into entering the 2019 Compensation Agreement. Plaintiff sought as damages a percentage of the profits earned by IDV from the C&D Deal.

On November 28, 2022, defendants moved to dismiss the complaint for failure to state a claim or, alternatively, to compel arbitration in accordance with the Arbitration Provision.

On January 20, 2023, the motion court issued a written decision granting defendants' motion to compel arbitration. When analyzing the enforceability of the Arbitration Provision, the court did not apply the heightened requirements established in Atalese v. U.S. Legal Services Group, L.P., 219 N.J. 430 (2014). In Atalese, the Court examined an arbitration provision in a consumer contract

A-0888-24

of adhesion signed by unsophisticated customers.  Id. at 446.  The Court held that in those circumstances, to be enforceable an arbitration provision must contain plain language conveying to the average customer he or she is waiving their right to sue in court and explaining what arbitration is and how it differs from seeking judicial relief.  Ibid.  The motion court found "this case involves businessmen who regularly dealt with contracts and business needs, had experience in business, and largely communicated with each other throughout the formulation of the Compensation Agreement."  The court found to the sophisticated party, such as plaintiff, the Arbitration Provision "clearly contemplates the foregoing of court proceedings and the right to jury trials."  Thus, the court concluded the Arbitration Provision constituted a valid waiver of plaintiff's right to seek judicial resolution of disputes arising under the 2019 Compensation Agreement.  A January 20, 2023 order directed the parties to proceed to arbitration and dismissed the complaint without prejudice.

Plaintiff subsequently moved for reconsideration of the January 20, 2023 order.  In support of his motion, plaintiff filed a certification claiming he is not a sophisticated businessperson and did not understand the Arbitration Provision precluded him from seeking judicial relief.  Plaintiff explained he was a high school graduate with some credits from community college, but no higher

A-0888-24

education degree. He claimed his experience with negotiating contracts was almost exclusively limited to licensing agreements and he reviewed those contracts only to ensure the negotiated business terms, such as prices, unit numbers, and related matters, were correct. He certified he never reviewed any other provisions of IDV contracts, including arbitration clauses, and the company's contracts primarily were drafted by Beshada.

Plaintiff certified he never negotiated for or against an arbitration provision in a contract and thought arbitration and mediation were synonymous. According to plaintiff, when he signed the 2019 Compensation Agreement, he believed he was agreeing to attempt to settle any dispute that might arise under the contract prior to seeking judicial relief. He did not understand arbitration excluded judicial remedies. Plaintiff certified the plain text of the Arbitration Provision does not mention waiver of judicial remedies and comports with his then-understanding of arbitration.

Plaintiff also expressed his belief Beshada was acting on behalf of plaintiff and Khubani during the negotiations of the 2019 Compensation Agreement. Plaintiff acknowledged, however, he "of course" knew "that at the end of the day [Beshada's] allegiance was ultimately with [Khubani]." Plaintiff claimed arbitration was never discussed during the negotiations and, assuming

11

Beshada drafted the 2019 Compensation Agreement, alleged Beshada acted inappropriately by including the Arbitration Provision in the final agreement.

On March 24, 2023, the court issued a written decision granting in part plaintiff's motion. The court acknowledged it did not apply the express waiver requirements established in <u>Atalese</u> because it considered plaintiff to be a sophisticated businessperson. However, the court found plaintiff's certification raised genuine issues of material fact with respect to his level of sophistication. The court explained:

> To consider [p]laintiff a sophisticated businessman and compel arbitration may cause prejudice to [p]laintiff which could be easily avoidable with continued discovery as to [p]laintiff's sophistication. However, should [p]laintiff constitute a sophisticated businessman with experience in contracting, the arbitration provision would be otherwise enforceable. In addition, further discovery as to all negotiations surrounding the contract and whether the parties were represented by counsel or had the opportunity to be represented by counsel may impact whether or not the [p]laintiff had equal bargaining power as the [d]efendant[s].

In a March 24, 2023 order, the court granted plaintiff's motion in part, vacated its January 20, 2023 order, reinstated the complaint, and established a schedule for discovery relating to plaintiff's sophistication as a businessperson and the bargaining power of the parties to the 2019 Compensation Agreement.

12

On July 26, 2023, plaintiff filed an amended complaint. He did not change counts one (common law fraud), two (equitable fraud), three (fraudulent inducement), four (fraudulent misrepresentation), and six (unjust enrichment), which were all allegations against Khubani and IDV. However, the amended complaint added Beshada as a defendant along with Khubani and IDV to count five (negligent misrepresentation), added counts nine (improper interference with prospective economic advantage) and ten (civil conspiracy) against Khubani, IDV, and Beshada, and added counts seven (legal malpractice) and eight (negligence) against only Beshada.[3]

After the close of the limited discovery, defendants moved to compel arbitration on all claims except the legal malpractice and negligence claims alleged only against Beshada, which the parties do not dispute are not subject to the Arbitration Provision. Plaintiff opposed the motion, arguing the Arbitration Provision was not enforceable as a matter of law and the entire controversy doctrine precluded enforcement of the Arbitration Provision because his legal malpractice and negligence claims against Beshada are not arbitrable and should be tried with the remaining claims.

---

[3] Because of a conflict posed by the retired Superior Court judge plaintiff consulted with respect to representation, the matter was transferred from Passaic County to Bergen County and assigned to a new judge.

A-0888-24

On October 11, 2024, the court entered an order granting defendants' motion. In an oral decision, the court found there was no genuine issue of material fact with respect to plaintiff's business sophistication. The court found plaintiff: (1) actively negotiated better terms for himself in the 2019 Compensation Agreement after Khubani's initial offer; (2) negotiated an amendment to the agreement providing him a $1 million bonus; (3) had experience reviewing complex contracts prior to and during his employment with IDV; and (4) was "involved in discussions with IDV's executive team regarding the legal implications of placing an arbitration" provision in contracts between IDV and its customers.

The court found:

> [P]laintiff is, in fact, a sophisticated businessperson. Notwithstanding the fact that the plaintiff asserts his attaining only a high school education, the [c]ourt finds that the plaintiff has been a highly compensated veteran executive with decades of experience running companies, negotiating terms of complex business documents, . . . [and] overseeing and managing operations of significant business entities.
>
> [T]he record shows that the plaintiff is no stranger to negotiating his own executive compensation packages during his career, and was sophisticated enough to . . . consult with counsel in order to address the 2019 agreement . . . .

14

A-0888-24

The motion court also found plaintiff "had significant bargaining power in the negotiation of the 2019 [C]ompensation [A]greement . . . certainly similar to that of . . . Khubani." The court emphasized plaintiff and Khubani had a longstanding business relationship and plaintiff alleged in his amended complaint "the C&D [D]eal was at risk of falling through if he did not stay on as [IDV's] [P]resident and COO." The court found those circumstances increased plaintiff's relative bargaining power during negotiations. The court noted plaintiff "rejected the initial agreement, negotiated the agreement over a period of months, had an opportunity, and exercised an opportunity to consult with an attorney, if not retain an attorney."

In addition, the court rejected plaintiff's invitation to reexamine the enforceability of the Arbitration Provision. The court found the prior judge had twice rejected plaintiff's arguments regarding enforceability and granted partial reconsideration only to address "new issues involving [plaintiff's] sophistication as a businessman and someone who may or may not deal with contracts containing arbitration provisions, or whether the parties had equal bargaining power." Thus, the court applied the law of the case doctrine and concluded there was "no reason to disturb the portion of [the prior judge's] ruling compelling

arbitration provided that the issues of business sophistication and bargaining power are satisfactory to the [c]ourt and consistent with that ruling."

An October 11, 2024 order memorialized the motion court's decision, granted defendants' motion and directed the parties to proceed to arbitration on all claims other than the legal malpractice and negligence claims alleged only against Beshada, which the court stayed pending the outcome of the arbitration.

This appeal followed. Plaintiff argues: (1) the Arbitration Provision is not enforceable because he is not a sophisticated businessperson and did not knowingly waive his right to seek judicial relief; (2) the entire controversy doctrine requires all his claims, including his legal malpractice and negligence claims against Beshada be adjudicated together; and (3) the motion court violated the law of the case doctrine.

II.

A.    Enforcement of the Arbitration Provision.

Plaintiff argues the motion court erred when it concluded he knowingly waived his right to seek judicial relief and agreed to resolve all claims arising from the 2019 Compensation Agreement through arbitration. We disagree.

"We review a trial court's order granting or denying a motion to compel arbitration de novo because the validity of an arbitration agreement presents a

question of law." Ogunyemi v. Garden State Med. Ctr., 478 N.J. Super. 310, 315 (App. Div. 2024) (citing Skuse v. Pfizer, Inc., 244 N.J. 30, 46 (2020) (holding a trial court's interpretive analysis should not be deferred to unless an appellate court finds its reasoning persuasive)). In reviewing an order compelling arbitration, "we are mindful of the strong preference to enforce arbitration agreements, both at the state and federal level." Hirsch v. Amper Fin. Servs., LLC, 215 N.J. 174, 186 (2013). However, that preference is not "without limits." Garfinkel v. Morristown Obstetrics & Gynecology Assocs., P.A., 168 N.J. 124, 132 (2001).

"When reviewing a motion to compel arbitration, courts apply a two-pronged inquiry: (1) whether there is a valid and enforceable agreement to arbitrate disputes; and (2) whether the dispute falls within the scope of the agreement." Wollen v. Gulf Stream Restoration & Cleaning, LLC, 468 N.J. Super. 483, 497 (App. Div. 2021) (citing Martindale v. Sandvik, Inc., 173 N.J. 76, 83 (2002)).

A court must apply "state contract-law principles" to determine "whether a valid agreement to arbitrate exists." Hojnowski v. Vans Skate Park, 187 N.J. 323, 342 (2006). Under our state's defined contract-law principles, an enforceable agreement requires: (1) consideration; (2) a meeting of the minds

17

based on a common understanding of the contract terms; and (3) unambiguous assent. Martindale, 173 N.J. at 87-89. Because consideration and plaintiff's assent to the 2019 Compensation Agreement are not in dispute, we turn to whether there was a meeting of the minds on the Arbitration Provision.

An agreement to arbitrate is a threshold issue when determining the validity of an arbitration clause. Knight v. Vivint Solar Dev., LLC, 465 N.J. Super. 416, 426 (App. Div. 2020). Consequently, to be enforceable, the terms of an arbitration agreement "must be the product of mutual assent," which "requires that the parties have an understanding of the terms to which they have agreed." Atalese, 219 N.J. at 442. "No particular form of words is necessary to accomplish a clear and unambiguous waiver of rights." Id. at 444; see also Morgan v. Sanford Brown Inst., 225 N.J. 289, 309 (2016) ("No magical language is required to accomplish a waiver of rights in an arbitration agreement.").

However, in Atalese, the Court established heightened standards for proving assent to arbitration in some circumstances. In that case, the Court invalidated an arbitration provision of a consumer contract of adhesion because it: (1) did not include an explanation the plaintiff was waiving her right to seek relief in court; (2) did not explain what arbitration is or how it differs from seeking judicial relief; and (3) lacked the plain language necessary to convey to

the average consumer he or she was waiving the right to sue in court. 219 N.J. at 446. The Court noted "an average member of the public may not know – without some explanatory comment – that arbitration is a substitute for the right to have one's claim adjudicated in a court of law." Id. at 442. Thus, in those circumstances, an arbitration clause "in some general and sufficiently broad way, must explain that the plaintiff is giving up her right to bring her claims in court or have a jury resolve the dispute." Id. at 447.

The Court later explained its holding in Atalese was driven by the nature of the underlying consumer contract:

> We were guided essentially by twin concerns. First, the Court was mindful that a consumer is not necessarily versed in the meaning of law-imbued terminology about procedures tucked into form contracts. The decision repeatedly notes that it is addressing a form consumer contract, not a contract individually negotiated in any way; accordingly, basic statutory consumer contract requirements about plain language implicitly provided the backdrop to the contract under review. And, second, the Court was mindful that plain language explanations of consequences had been required in contract cases in numerous other settings where a person would not be presumed to understand that what was being agreed to constituted a waiver of a constitutional or statutory right.
>
> . . . .
>
> The consumer context of the contract mattered.

A-0888-24

[Kernahan v. Home Warranty Adm'r of Fla., Inc., 236
N.J. 301, 319-20 (2019).]

The Court also has applied Atalese to an employment contract, although whether that contract was negotiated by sophisticated parties with relatively equal bargaining power was not addressed by the Court. See Flanzman v. Jenny Craig, Inc., 244 N.J. 119, 124 (2020).

In County of Passaic v. Horizon Healthcare Services, 474 N.J. Super. 498, 503-04 (App. Div. 2023), we explained our understanding of the Court's application of the holding in Atalese thusly:

> This concern for those not versed in the law or not necessarily aware of the fact that an agreement to arbitrate may preclude the right to sue in a court or invoke the inestimable right of trial by jury . . . vanishes when considering individually-negotiated contracts between sophisticated parties – often represented by counsel at the formation stage – possessing relatively similar bargaining power. Although our Supreme Court has not expressly declared it, and although we too have not said as much in any published opinion, we are satisfied . . . that an express waiver of the right to seek relief in a court of law to the degree required by Atalese is unnecessary when parties to a commercial contract are sophisticated and possess comparatively equal bargaining power.
>
> [(footnote omitted).]

See also In re Remicade (Direct Purchaser) Antitrust Lit., 938 F.3d 515, 525-26 (3d Cir. 2019) (holding Atalese does not apply where the parties have relatively

equal bargaining power and levels of sophistication); GAR Disability Advocs., LLC v. Taylor, 365 F. Supp. 3d 522, 531 (D.N.J. 2019) (same).

We agree with the holding in Horizon and, therefore, reject plaintiff's argument the stricter Atalese standards apply here. There is ample support in the record for the motion court's finding plaintiff was not the average consumer and the 2019 Compensation Agreement was not a consumer contract of adhesion. The record establishes plaintiff is a sophisticated businessperson with nearly five decades of experience and an impressive record of high-level participation in successful and profitable endeavors. He negotiated lucrative executive compensation agreements both before joining IDV and after becoming the President and COO of the company. Plaintiff reviewed high-value contracts with IDV customers, ensuring the accuracy of essential terms in the agreements. In addition, he participated in discussions at IDV with respect to including arbitration provisions in the company's agreements with its customers to protect the IDV from class action litigation. As the motion court found, the record establishes plaintiff's lack of a higher education was outweighed by his abundance of real-world business experience.

In addition, the 2019 Compensation Agreement was the result of months of negotiations between plaintiff and Khubani, with participation by Beshada.

21

While plaintiff elected to conduct negotiations without counsel, he considered hiring an attorney before the final agreement had been reached. Plaintiff told Beshada he was contemplating retaining counsel to continue negotiating on his behalf, an implicit admission he knew Beshada did not represent him in the contract negotiations. In fact, plaintiff contacted a retired Superior Court judge to represent him in the contract negotiations, only to decide against retaining him as counsel. Plaintiff opted to rely on his vast business experience and prior success at negotiating his executive compensation agreement instead of retaining counsel.

The record also supports the motion court's finding plaintiff had relatively equal bargaining power with Khubani during the negotiations. Plaintiff and Khubani had a successful and profitable business relationship spanning more than twenty years. Plaintiff served at the highest levels of IDV, as EVP, President and COO. The company experienced growth and high profits during plaintiff's service. The 2013 Compensation Agreement expired on December 31, 2018. At that time, IDV was in the late stages of due diligence on the $900 million C&D Deal. Plaintiff played a vital role in arranging that transaction and admits he was told by Beshada the C&D Deal would collapse if he did not agree to stay on as President and COO of IDV.

22

Under these circumstances, plaintiff was well-positioned to ensure a favorable compensation agreement. Khubani, on the other hand, risked sabotaging a nearly $900 million transaction if he was unable to secure plaintiff's continued employment in those high-ranking positions.

Plaintiff signed each page of the 2019 Compensation Agreement, including the page containing the Arbitration Provision. He did not question the inclusion of the provision in the agreement. Plaintiff also negotiated an amendment to the agreement, which also included an Arbitration Provision, to secure an additional $1 million in compensation. Again, plaintiff did not question inclusion of the Arbitration Provision in the amended agreement. We conclude the motion court correctly determined the validity of the Arbitration Provision without application of the strict standards established in Atalese.[4]

B.    The Entire Controversy Doctrine.

We are not persuaded by plaintiff's argument reversal of the trial court's decision is mandated by the entire controversy doctrine. The entire controversy

_____

[4] Because plaintiff's notice of appeal lists only the October 11, 2024 order, we did not consider the January 20, 2023, and March 24, 2023 orders addressing the legal enforceability of the Arbitration Provision. See R. 2:5-1(f)(2)(ii) (stating that a notice of appeal "shall designate the judgment, decision, action or rule, or part thereof appealed from."); Fusco v. Bd. of Educ. of Newark, 349 N.J. Super. 455, 461-62 (App. Div. 2002) (stating appellate review pertains only to judgments or orders specified in the notice of appeal).

doctrine set forth in Rule 4:30A is a procedural rule that "seeks to impel litigants to consolidate their claims arising from a single controversy whenever possible." Dimitrakopoulos v. Borrus, Goldin, Foley, Vignuolo, Hyman and Stahl, P.C., 237 N.J. 91, 98 (2019) (quoting Thornton v. Potamkin Chevrolet, 94 N.J. 1, 5 (1983) (internal quotation marks omitted)). The doctrine is designed to promote fairness to the parties, judicial efficiency, and complete and final dispositions by avoiding piecemeal litigation. DiTrolio v. Antiles, 142 N.J. 253, 267 (1995). The underpinnings of the doctrine "are the twin goals of ensuring fairness to parties and achieving economy of judicial resources." Kent Motor Cars, Inc. v. Reynolds & Reynolds, Co., 207 N.J. 428, 443 (2011).

Because the doctrine is equitably rooted, its applicability is left to judicial discretion based on the particular circumstances inherent in a given case. Mystic Isle Dev. Corp. v. Perskie & Nehmad, 142 N.J. 310, 323 (1995). However, "[w]e review de novo the law guiding the trial court's determination as to the entire controversy doctrine." Francavilla v. Absolute Resols. VI, LLC, 478 N.J. Super. 171, 178 (App. Div. 2024).

The application of the entire controversy doctrine to legal malpractice claims and the difficulties that arise therein was considered by the Supreme Court in Olds v. Donnelly, 150 N.J. 424 (1997). There, the Court "exempt[ed]

all attorney-malpractice actions from the entire controversy doctrine." Id. at 442. "[T]he entire controversy doctrine does not compel joinder of legal-malpractice claims in underlying actions." Donohue v. Kuhn, 150 N.J. 484, 488 (1997).

It will be significantly more efficient to adjudicate plaintiff's contract and fraud-related claims as an initial matter because any damages for legal malpractice will be assessed based on plaintiff's losses in the underlying claim. Unless and until plaintiff can establish liability and that he suffered damages in the underlying contract and fraud claims, he does not have a prima facie claim of legal malpractice or negligence against Beshada.

C. The Law of the Case Doctrine.

Finally, the law of the case doctrine directs that "a legal decision made in a particular matter 'should be respected by all other lower or equal courts during the pendency of that case.'" Lombardi v. Masso, 207 N.J. 517, 538 (2011) (quoting Lanzet v. Greenberg, 126 N.J. 168, 192 (1991)). The doctrine is discretionary, but embodies the judicial policy that "once an issue is litigated and decided in a suit, relitigation of that issue should be avoided if possible." Gonzalez v. Ideal Tile Importing Co., Inc., 371 N.J. Super. 349, 356 (App. Div. 2004) (quoting Sisler v. Gannett Co., Inc., 222 N.J. Super. 153, 159 (App. Div.

A-0888-24

1987)).  "[R]elitigation of an interlocutory order before successive judges of coordinate jurisdiction is generally disfavored, and the 'law of the case' doctrine invests the court with discretion to decline relitigation of any legal decision made earlier by an equal court in the same case."  Akhtar v. JDN Props. at Florham Park, LLC, 439 N.J. Super. 391, 399-400 (App. Div. 2015).

The doctrine, "insofar as it is applied to rules or orders of an interlocutory nature is itself discretionary.  It should be applied flexibly to serve the interests of justice."  State v. Reldan, 100 N.J. 187, 205 (1985).  "Thus the proper exercise of this discretion should take into account a number of relevant factors that bear on the pursuit of justice and, particularly, the search for truth."  Ibid.  The factors to be considered in re-examining an interlocutory order are:  (1) an unfair advantage over the non-moving party, (2) the moving party's good faith, and (3) fairness to the non-moving party.  Id. at 205-06.  Whether the court "correctly applied the law-of-the-case doctrine is a matter of law, and therefore our standard of review is de novo."  State v. K.P.S., 221 N.J. 266, 276 (2015).

We are not persuaded by plaintiff's arguments the law of the case doctrine did not apply to the January 20, 2023, and March 24, 2023 orders because:  (1) the court vacated the orders when it ordered discovery on plaintiff's status as a sophisticated businessperson and the bargaining power of the parties, thereby

nullifying the court's decision with respect to the enforceability of the Arbitration Provision; and (2) the orders were issued prior to the filing of the Amended Complaint, which contained allegations negating the court's initial analysis of the enforceability of the Arbitration Provision. Neither argument is supported by the record.

Although the March 24, 2023 order vacated the January 20, 2023 order in part, the court explicitly provided that "should [p]laintiff constitute a sophisticated businessman with experience in contracting, the arbitration provision would be otherwise enforceable." Prior to entry of the October 11, 2024 order, the court recognized the continued validity of the court's interpretation of the enforceability of the Arbitration Provision:

> I do acknowledge that plaintiff's argument that the March order vacates the initial – the January order, in terms of the arbitration clause I respectfully disagree with that argument. I find that it did not entirely vacate the order and in fact contemplated that this limited discovery would take place to determine the issues of sophistication and bargaining power in order to determine whether or not the arbitration clause would be implemented.

The addition of Beshada as a defendant in the amended complaint had no bearing on the court's analysis of the enforceability of the Arbitration Provision. That decision was based on the text of the provision. While plaintiff alleges

Beshada's conduct affects the overall validity of the 2019 Compensation Agreement, whether the text of the Arbitration Provision was sufficient to constitute plaintiff's assent to arbitrate any disputes that arise from the agreement does not depend on the conduct attributed to Beshada in the amended complaint.

To the extent we have not specifically addressed any of plaintiff's remaining contentions, we conclude they lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hanley

Clerk of the Appellate Division